G & N AIRCRAFT, INC. and Paul
Goldsmith, Appellants–
Defendants,

v.

Erich BOEHM, for himself as minority
shareholder of G & N Aircraft,
Inc., Appellee–Plaintiff.

No. 45A05–9708–CV–323

Court of Appeals of Indiana.

Nov. 30, 1998.

Rehearing Denied Feb. 9, 1999.

Gilbert F. Blackmun, Leonard M. Holajter, Blackmun, Bomberger & Moran, Highland, for Appellant–Defendant G & N Aircraft, Inc.

Nana Quay–Smith, Karl L. Mulvaney, Bingham Summers Welsh & Spilman, Indianapolis, Samuel T. Miller, Komyatte & Freeland, P.C., Highland, for Appellant–Defendant Paul Goldsmith.

Paul A. Rake, Gregory A. Crisman, John P. Twohy, Eichhorn & Eichhorn, Hammond, for Appellee–Plaintiff.

## OPINION

BAKER, Judge.

Appellants-defendants G & N Aircraft, Inc. (G & N) and Paul Goldsmith appeal the trial court's judgment entered in favor of Erich Boehm as minority shareholder of G & N, claiming that it was error to hold both Goldsmith and G & N liable for breach of a fiduciary duty, that summary judgment was erroneously entered for Boehm with respect to G & N's counterclaim and that it was error to award attorney fees and punitive damages.

### FACTS

Goldsmith and Ray Nichols began G & N in 1962 as an aircraft engine business which rebuilt piston engines. G & N is a closely-held corporation which currently operates from a hangar at Griffith Airport. Goldsmith eventually purchased Nichols' interest and became the sole owner of G & N. In 1980, Goldsmith sold G & N to the Van Dussen Corporation. (Van Dussen). Sometime thereafter, Goldsmith sought to repurchase the business but did not have adequate funds to do so. As a result, Goldsmith formed a group of investors which included Boehm, Gilliland and McCoy. Following the purchase, Goldsmith, Boehm and two additional investors, McCready and Keeling, each held a 20% interest in G & N, while McCoy and Gilliland each held a 10% interest in the corporation. The 20% shareholders, including Boehm, each invested $125,000 toward the purchase of G & N's assets. McCready eventually died, and shortly thereafter, Keeling sold his shares. Boehm acquired a total of 34% of the stock and Gilliland and McCoy owned 16 and 2/3% each. Goldsmith's son Greg acquired the remaining 6 and 2/3% of

the corporation, while Goldsmith retained 26%. All five shareholders were directors of G & N. Goldsmith served as president, Boehm as vice-president, and Gilliland as secretary.

In addition to his ownership interest in G & N, Goldsmith also operated the Griffith Airport property and owned three other aviation-related companies doing business at the airport: Griffith Aviation, which manages the airport and operates a Flight Base Operations (FBO) terminal; Great Northern Aircraft Sales, Inc., an aircraft sales and maintenance company; and Great Northern Aircraft, Inc., which was engaged primarily in the purchase and sales of jet aircraft. Griffith Aviation operated the FBO at a breakeven position, while Great Northern Aircraft Sales conducted business at a loss. G & N paid rent to Griffith Aviation and since 1988, it has leased 27,000 square feet in accordance with a verbal month-to-month lease with Goldsmith. Until May of 1995, Goldsmith also held a 47% interest in Edgecumbe–G & N which is a distributor for aircraft engine parts.[1] Edgecumbe was the primary supplier of engine parts to G & N for its rebuilding business and was highly dependent on G & N which accounted for nearly 49% of its total sales.

During the 1990's, Great Northern Aircraft sustained losses when its aircraft inventory could not be sold at the expected market price. Great Northern's inventory had been financed by a $1.2 million loan from NBD Bank which Goldsmith had personally guaranteed. The inventory was ultimately liquidated with sales bringing less than the purchase price of the aircrafts. Neither Great Northern nor Griffith Aviation was able to pay the NBD loan, which remained due and collectible against Goldsmith. During that time, however, G & N earned a net income averaging approximately $220,000 per year. In 1989, G & N had sold its inventory that was acquired from Aviall corporation at a high profit margin. These sales resulted in above-average net income of nearly $1.3 million. Additionally, in 1993, an inventory adjustment for undervalued used engine cores

---

1. McCoy and Gilliland held the remaining interest in Edgecumbe.

was required by the Internal Revenue Service which amounted to an additional $758,158 in profits to G & N.

In 1992, Goldsmith retained Matt Hunniford as his personal accountant and requested his advice as to the income variations among the companies for tax planning purposes. Hunniford advised that Goldsmith use $1.8 million in tax losses from Griffith Aviation and the Great Northern entities by setting them off against G & N's profits. Thereafter, in June of 1994, Hunniford met with DeVaughn Williams, a loan officer at NBD Bank, to propose an additional $1.25 million loan from NBD to help Goldsmith buy out G & N and effect their plan. Hunniford set forth documentation to explain how Goldsmith would purchase an additional 50.67% of G & N stock which would then enable him to use the tax loss carry-forwards in Griffith Aviation and Great Northern against G & N's income.

On July 13, 1994, Ryan, who was Goldsmith's comptroller, forwarded additional documentation in support of the loan application to Williams at NBD. Ryan's written correspondence explained how a purchase of G & N would allow Goldsmith a sufficient tax advantage to enable him to repay both the existing $1.2 million loan from NBD along with the new loan. Pint, another loan officer with NBD, met with Ryan and Goldsmith at the Griffith Airport on September 7, 1994 where they discussed "some of the issues regarding Goldsmith's take-over of G & N." R. at 2211. Ryan explained that "the consolidation of the existing entities with G & N to capture roughly $1.8 million in tax loss carry-forwards was integral to the deal." R. at 2211.

On September 12, 1994, Hunniford wrote Goldsmith informing him of the effect of tax-free mergers and the use of tax loss carry-forwards under the Internal Revenue Code. Hunniford explained that while the net operating losses could be used to offset income from G & N, 100% ownership of G & N would be required. Ryan then wrote to Pint on September 13, 1994 changing the amount of the loan request and estimating a need for "an additional loan of between $750,000 to $1,000,000 to buy out Mr. Goldsmith's cur-

rent partners in G & N Aircraft." R. at 2164.

During that same period, Goldsmith requested Don O'Dell, G & N's corporate counsel and accountant to value G & N "for purposes of sale or purchase of the shares." R. at 2164. On October 3, 1994, O'Dell estimated the value of G & N's 6,200 outstanding shares at $155 per share, or $961,000. As a result, Goldsmith pursued his Edgecumbe partners, McCoy and Gilliland, about acquiring their shares in G & N. At about the same time, NBD rejected Goldsmith's loan application.

The following year, Goldsmith renewed discussions with NBD Bank concerning a merger of G & N with Goldsmith's other companies at the airport. On April 18, 1995, Ryan again met with loan officer Pint to negotiate the tentative plan. Specifically, the following memo from Pint described Goldsmith's desire to purchase Boehm's interest for the tax benefit:

> Mr. Goldsmith will attempt to buy out Eric [sic] Boehm and gain control of the company. The plan is a cash buy out $400,000 over a period of time. This would give Paul a 67% ownership in G & N and he would then convert the company into a 'C' corporation and consolidate all of the airport-related debt. This would allow him to take advantage of the tax loss carry forward of Great Northern Aviation and the other related entities.

R. at 2216. Goldsmith and Ryan also explained to Pint their plan to break the impasse in negotiations with McCoy and Gilliland for the purchase of their G & N shares. Pint recorded in his bank notes as follows:

> After gaining a controlling interest in G & N Aircraft, [Goldsmith] would stop using Edgecumbe G & N as a supplier in order to force the other two partners in G & N Edgecumbe to sell their shares of stock.

R. at 2216. Pint also documented that "Mr. Goldsmith may need $200,000 to help finance the purchase of Eric [sic] Boehm's stock." R. at 2216. In addition to the above, Goldsmith suggested that he could threaten liquidation of the airport and the airport-related companies. If liquidation were required,

"Mr. Goldsmith would then send letters to the three partners raising the rent of G & N from $6,500 to $30,000 a month and announcing his resignation from G & N. This action would force the remaining partners to move G & N to another airport." R. at 2216.

Early in 1995, Goldsmith requested a meeting with Boehm at the office of Goldsmith's attorney, Sam Miller. During the meeting held on April 26, 1995, Goldsmith offered Boehm $200,000 for his 34% interest in G & N. Boehm rejected that offer. Two days later, Goldsmith sent Boehm a notice giving G & N thirty days to vacate its facilities at the Griffith Airport. Copies of the eviction notice were also sent to McCoy and Gilliland. Goldsmith also submitted a letter of resignation from his positions as president and director of G & N, dated April 29, 1995, as an enclosure with his eviction notice dated the previous day. After receiving the eviction notice, McCoy and Gilliland agreed to trade their G & N stock for Goldsmith's Edgecumbe stock. Both remained on the Board of Directors. The stock transfer agreement was made retroactive to January 1, 1995. As a result of this action, Boehm began searching for an alternate location to which the company might move as the notice of eviction required that G & N quit the premises in one month.

Thereafter, on May 12, 1995, Ryan wrote Pint at NBD, explaining the planned merger of G & N with Great Northern and Griffith Aviation. In relevant part, this correspondence provided as follows:

> Currently, we are negotiating with Eric [sic] for his stock and we feel that we will be able to obtain the stock within 2 weeks. However, if Erich will not be reasonable we are prepared to leave [sic] him remain as minority shareholder. We have thoroughly researched this possibility and have come to the conclusion that Paul as 66% majority owner would have the legal right to merge the companies with the debt, change the corporation's status from S to C and use the cash flow to retire any and all debt. Erich will have no recourse and therefore not be a factor.

R. at 2182.

In the meantime, Boehm sent notice of a meeting of the G & N board of directors for May 22, 1995. As vice-president of the company, Boehm proposed that G & N move its plant to a location in South Chicago. This motion died for want of a second by McCoy, Gilliland or Goldsmith. Gilliland then moved that Goldsmith be re-elected a director of G & N. Greg Goldsmith, Paul's son, seconded the motion, and it was carried with McCoy, Gilliland and Greg voting in favor. Goldsmith was also re-elected president of G & N.

At a board of directors meeting conducted on June 14, 1995, Gilliland resigned as Secretary of G & N and Greg Goldsmith was appointed in his place. Hunniford was invited to the meeting and explained that no distribution would be made of the company's 1994 earnings. The directors then addressed the issue of whether to move G & N from its location at the Griffith Airport. Goldsmith questioned Boehm's proposed location in south Chicago raising concerns over the "negative effects ... if the company moves to a new facility not located on an airport" and the likely shut-down of G & N pending decertification by the Federal Aviation Administration. R. at 2680. Finally, Goldsmith lifted the threat of eviction and the meeting adjourned.

Thereafter, on June 21, 1995, Goldsmith wrote Boehm a letter demanding his G & N stock for $250,000. Goldsmith also threatened him with the consequences of his plan to merge G & N with his other companies. In a portion of the letter, Goldsmith wrote that: "The result of my drastic action is that Jim and Rich have sold their stock to me and therefore I now control over 59% of the outstanding shares. At this point it is obvious that I do not need to obtain your shares in order to make the changes I know are necessary to put G & N back on course." R. at 2018. Goldsmith also informed Boehm that if he refused to sell, Boehm would have to resign from G & N's board of directors and as vice-president, move out of his office at G & N, surrender his keys and stay off of the premises.

Upon learning that Boehm refused Goldsmith's demands, G & N's locks were changed and Boehm was prevented from entering the premises. Goldsmith then

terminated the employment of G & N's bookkeeper and shifted the company's accounting records to the offices of Griffith Aviation, where G & N's accounting was taken over by employees of Griffith Aviation including Tom Ryan.

As a consequence of these actions, Boehm filed a verified complaint captioned as a shareholder derivative action "for himself and as minority shareholder of G & N Aircraft," naming Goldsmith and G & N as defendants on June 27, 1995. For his complaint, Boehm alleged that Goldsmith obtained a majority interest in G & N by breaching his fiduciary duties to the corporation and his fellow shareholders, that Goldsmith coerced other shareholders into selling their interest in a conspiracy to "freeze out"[2] Boehm, that Goldsmith attempted to benefit himself to the detriment of G & N, that a preliminary injunction should be issued to protect the corporate assets, and that equity should intervene to preclude a coerced buyout for less than a fair price of Boehm's minority interest. R. at 17–22. Boehm also alleged that G & N had breached a fiduciary duty to him in that it had squandered assets and was not seeking to maximize long-run return for its shareholders. Additionally, Boehm asserted that G & N was wrongfully withholding dividend distributions.

Thereafter, on August 10, 1995, Boehm obtained a preliminary injunction to prevent Goldsmith's further damage to his interests pending trial. Notwithstanding Boehm's complaint, Ryan wrote Pint explaining that the cause of action would not prevent them from achieving the goal of combining G & N Aircraft with the other companies in order to establish an entity that would be able to "carry and service the debt." R. at 2174.

On August 22, 1995, Boehm filed an amended complaint for shareholder derivative action and breach of fiduciary and contract duties. R. at 186. The complaint added Gilliland and McCoy as defendants[3] because of their conduct in selling out to Goldsmith in accordance with his alleged conspiracy to remove profits of G & N through their separate entity. Boehm requested that the court dissolve the corporation and direct that the assets be sold. R. at 189. Boehm also sought permanent injunctive relief to preclude any mergers of G & N with any of the entities owned or controlled by Goldsmith. R. at 189.

On October 16, 1995, G & N filed its answer to Boehm's complaint and instituted a counterclaim against Boehm alleging that the case was frivolous and that it was entitled to attorney fees. Thereafter, Boehm filed a motion for summary judgment with respect to G & N's counterclaim, asserting that the trial court's issuance of a preliminary injunction demonstrated that his cause of action was not frivolous or groundless and that there was no genuine issue of material fact as to that counterclaim. G & N and Goldsmith also filed motions for summary judgment with respect to various counts set forth in Boehm's complaint. Following a hearing conducted on October 8, 1996, the trial court denied the defendants' summary judgment motions. However, the court granted Boehm's motion with respect to G & N's counterclaim and determined that it was frivolous because G & N asserted it more than two months after the entry of the preliminary injunction. As a result, G & N was ordered to pay Boehm's expenses and attorney fees in responding and defending the counterclaim.

Prior to trial, G & N and Goldsmith tendered written requests for specific findings of fact and conclusions of law pursuant to Ind. Trial Rule 52(B). Following a four-day trial by the court which commenced on November 12, 1996, the trial court entered judgment and the following award of damages in Boehm's favor on May 2, 1997:

> Erich Boehm [shall] have and recover a judgment against Defendants G & N Aircraft, Inc. and Paul Goldsmith jointly and

---

**2.** A freeze-out is defined as the use of corporate control vested in the statutory majority of shareholders or the board of directors to eliminate minority shareholders from the enterprise or reduce their voting power or claims on corporate assets to relative insignificance. *Gabhart v. Gab-*hart, 267 Ind. 370, 388, 370 N.E.2d 345, 353 (1977).

**3.** Gilliland and McCoy were dismissed as defendants on October 20, 1995.

severally in the amount of $521,319.00. It is further ordered that Plaintiff Erich Boehm recover a judgment against Defendant, G & N Aircraft, Inc. in the amount of $173,939.00 plus 34% of the income of G & N for the years 1996 and until this judgment is paid in full.

It is further ordered that Plaintiff, Erich Boehm, have and recover a judgment for punitive damages against Defendant, Paul Goldsmith individually in the amount of $175,000.00.

It is further ordered that when this judgment is paid in full that Plaintiff Erich Boehm transfer his 34% of the outstanding shares of G & N either to G & N Aircraft, Inc. or to Paul Goldsmith at the election of the Defendants.

It is further ordered that Plaintiff, Erich Boehm shall recover attorneys fees in this action, which will be determined from the submission of documents set out above.

Supp. Record at 15. G & N and Goldsmith now appeal.

## DISCUSSION AND DECISION

### I. Standard Of Review

■ We initially note our standard of review. When a trial court has entered findings of fact and conclusions of law pursuant to a party's request, we engage in a two-tiered standard of review. We must first determine whether the evidence supports the findings of fact and then whether the findings support the judgment. *Heiligenstein v. Matney*, 691 N.E.2d 1297, 1299–1300 (Ind.Ct. App.1998). The court's findings and judgment will not be reversed unless clearly erroneous. *Id.* at 1300. Findings of fact are clearly erroneous when the record lacks any facts or reasonable inferences from the evidence to support them. *Id.* The judgment is clearly erroneous when it is unsupported by the findings of fact and conclusions entered on the findings. *Id.* In making these determinations, we will neither reweigh the evidence nor judge witness credibility, but we will consider only the evidence favorable to the judgment and all reasonable inferences therefrom. *Id.* We also note that when, as here, the court has made special findings pursuant to a party's request under T.R.

52(A), this court may affirm the judgment on any legal theory supported by the findings. *Mitchell v. Mitchell*, 695 N.E.2d 920, 923 (Ind.1998). Before affirming on a legal theory supported by the findings but not espoused by the trial court, we should be confident that its affirmance is consistent with all of the trial court's findings of fact and the inferences drawn from the findings. *Id.*

### II. Breach Of Fiduciary Duty

G & N and Goldsmith attack the trial court's findings contending that the judgment is erroneous because neither of them can be liable for breach of a fiduciary duty in this circumstance. Specifically, G & N asserts that it is not liable because a corporation owes no fiduciary duty to its shareholders. Goldsmith seeks to avoid liability on the theory that Boehm's claims were only derivative in nature. Thus, both defendants contend that the trial court's finding that they breached their fiduciary duties to Boehm is contrary to law.

### A. Liability of Goldsmith—Breach of Fiduciary Duty

■ Shareholders in a closely-held corporation stand in a fiduciary relationship to each other, and as such, must deal fairly, honestly, and openly with the corporation and with their fellow shareholders. *Barth v. Barth*, 659 N.E.2d 559, 561 (Ind.1995). Additionally, their acts must be for the benefit of the corporation and they are liable for breaches of trust. *Griffin v. Carmel Bank & Trust Co.*, 510 N.E.2d 178, 182 (Ind.Ct.App. 1987), *trans. denied.* Shareholders may not act out of avarice, expediency or self-interest in derogation of their duty of loyalty to the other stockholders and to the corporation. *Barth*, 659 N.E.2d at 561 n. 6. When it is established that one with a fiduciary duty has attempted to benefit from a questioned transaction, the law presumes fraud. *Dotlich v. Dotlich*, 475 N.E.2d 331, 342 (Ind.Ct.App. 1985). The burden of proof shifts to the party with the fiduciary duty to overcome the presumption by showing that his actions were honest and in good faith. *W & W*

*Equipment Co., Inc. v. Mink,* 568 N.E.2d 564, 573 (Ind.Ct.App.1991), *trans. denied.*

 Goldsmith asserts that a judgment for breach of a fiduciary duty may not stand because he acted for the benefit of the company and that Boehm did not suffer any loss other than the devaluation of his stock. Appellant's brief at 17. Moreover, he claims that there was no harm to Boehm as minority shareholder and contends that the trial court's finding that Goldsmith committed a breach when he plotted to merge his other corporations with G & N was erroneous because they were only "non-acts" which did not amount to the undertaking of any conduct which resulted in harm to Boehm. Appellant's brief at 18.

Contrary to Goldsmith's assertions, the evidence presented at trial demonstrated that Goldsmith, while still a shareholder at G & N, threatened the viability of the corporation in order to force other shareholders to sell their stock. Moreover, he increased G & N's costs and threatened G & N's relationship with other companies in order to manipulate the shareholders. Such multiple acts showed a process instituted by Goldsmith to seize control of G & N for his personal benefit which effectively rendered Boehm's stock worthless.

We also note that before Goldsmith's actions occurred, Boehm held a plurality interest in G & N which had substantial value. Boehm received dividends and needed only one other shareholder's vote to control the company. Through Goldsmith's actions, Boehm became a disadvantaged minority shareholder of G & N who was compelled to defer to a hostile majority shareholder. In light of this conduct, the evidence presented at trial and the trial court's findings show that there is no innocent explanation for Goldsmith's actions in furtherance of his takeover of G & N. As the record reflects, Goldsmith's conduct did not amount to dealing "fairly, honestly and openly with [the] corporation and fellow stockholders." *W & W Equip.,* 568 N.E.2d at 573. In essence, Goldsmith is merely requesting that we reweigh the evidence on appeal, which this court will not do. *Dotlich,* 475 N.E.2d at 342. Thus, the trial judge's determination that Goldsmith breached his fiduciary duty to Boehm is not contrary to law.

 Goldsmith, however, contends that the judgment is erroneous in light of our supreme court's holding in *Barth II*[4] which provides that "shareholders of a corporation may not maintain actions at law in their own names to redress an injury to the corporation even if the value of their stock is impaired as a result of the injury." *Barth II,* 659 N.E.2d at 560. Specifically, he asserts that the judgment is "fatally defective because [Boehm] failed to comply with the Indiana Business Corporation law [statutes], IND. CODE § 23–1–32–1 *et seq.*"[5] The *Barth II* court noted, however, that a trial court in its discretion may allow a direct claim by the minority shareholder against the corporation under certain conditions and the dictates of IND. CODE § 23–1–32–1 *et seq.* may be bypassed. As was determined in *Barth II:*

> In the case of a closely held corporation, the court in its discretion may treat an action raising derivative claims as a direct action, exempt it from those restrictions and defenses applicable only to derivative actions, and order an individual recovery, if it finds that to do so will not (I) unfairly expose the corporation or the defendants to a multiplicity of actions, (ii) materially prejudice the interests of creditors of the

4. The trial court initially dismissed the minority shareholder's complaint against the closely held corporation and its majority shareholder which was brought as a direct action which alleged a breach of fiduciary duty. We reversed the dismissal of the complaint in *Barth v. Barth,* 651 N.E.2d 291 (Ind.Ct.App.1995) (*Barth I* ), and our supreme court subsequently granted transfer, vacated our decision and remanded the cause to the trial court. *See Barth v. Barth,* 659 N.E.2d 559 (Ind.1995) (*Barth II* ).

5. To maintain a derivative action, the person must have been a shareholder at the time of the complained of transaction, the person must fairly and adequately represent the interests of the shareholders, and the complaint must be verified and allege that demand was made to obtain action by the board of directors, or allege why demand was not made. Additionally, the requirements provide for the dismissal of the cause of action by a special committee of the board of directors.

corporation, or (iii) interfere with a fair distribution of the recovery among all interested persons.

*Id.* at 562.

Similar to the circumstances presented in *Barth*, Boehm brought a cause of action against the majority shareholder and the corporation alleging that Goldsmith, as G & N's majority shareholder, caused a drastic reduction in dividends together with other steps that significantly reduced the value of Boehm's corporate ownership. In applying the exception to the requirements of I.C. § 23–1–32–1 *et seq.* set forth in *Barth II*, we observe that no evidence established that Boehm's cause of action would interfere with fair distribution of the recovery among all interested persons. Specifically we note, and the trial court so found, that the only other minority shareholder of G & N was Goldsmith's son, Greg. His interest in G & N, at 6 and 2/3 % of the outstanding shares in comparison to Boehm's 34%, represents a relatively small share of the corporation's earnings. Therefore, even if the trial court had determined that Greg was entitled to damages for the denial of distributions, those damages would be marginal. As a result, the trial court correctly concluded Boehm could present his derivative claims in a direct action without interfering with a fair distribution of recovery among interested persons.

Next, there has been no showing that permitting a direct action with respect to Boehm's derivative claims would unfairly lead to a multiplicity of actions. Here, the evidence leads to the sole conclusion that Greg displayed a conflict of interest and a certain amount of antagonism toward Boehm. Therefore, nothing is before us to support an assertion that Greg might have brought a cause of action against his father for breach of fiduciary duty. Finally, none of the evidence presented at trial demonstrated that granting Boehm recovery in a direct action would have materially prejudiced G & N's creditors. As the trial court found, G & N has posted annual sales averaging $5 million and annual net profits between $223,000 and $228,000.

Under the circumstances, we cannot say that the trial court abused its discretion in

permitting Boehm to proceed with his direct claims in accordance with the exceptions set forth in *Barth*. Thus, there was no error in permitting Boehm to assert these claims against Goldsmith.

### B. Damages—Goldsmith

■ Secondly, Goldsmith argues that the trial court's award of damages was erroneous. Specifically, he contends that the trial court erred in ordering Goldsmith and G & N to buy out Boehm at the full value of his shares when the parties had not executed a buy-sell agreement permitting or authorizing such an action and that the provisions of the dissenter's right statute, IND. CODE § 23–1–44–8 prohibit such a remedy. Appellant's brief at 37.

■ We initially observe that a shareholder in a closely-held corporation who suffers compensatory damages proximately caused by the breach of a fiduciary duty or fraud must be afforded a remedy. *Fleming v. International Pizza Supply Corp.*, 676 N.E.2d 1051, 1057 (Ind.1997). When the basis of liability is a failure to conform to a fiduciary duty, the measure of damages is the entire loss sustained. *W & W Equip. Co.*, 568 N.E.2d at 576. The person who sustains an injury is entitled to be placed in the same financial position as he would have occupied had the injury not occurred. *Remington Freight Lines, Inc. v. Larkey*, 644 N.E.2d 931, 941 (Ind.Ct.App.1994). A damage award rests with the trial court's discretion and will be upheld if it is supported by the evidence and is not based upon speculation or conjecture. *Scott–Reitz, Ltd. v. Rein Warsaw Assoc's.*, 658 N.E.2d 98, 105 (Ind.Ct.App.1995).

We first note the relevant provisions of the dissenter's right statute which Goldsmith asserts, prohibits a buy-out of Boehm's shares at full value:

(a) A shareholder is entitled to dissent from, and obtain payment of the fair value of the shareholder's shares in the event of, any of the following corporate actions:

(1) Consummation of a plan of merger to which the corporation is a party if:

(A) shareholder approval is required for the merger by I.C. 23–1–40–3 or the articles of incorporation; and

(B) the shareholder is entitled to vote on the merger.

. . .

(3) Consummation of a sale or exchange of all, or substantially all, of the property of the corporation . . .

I.C. § 23–1–44–8.

While Goldsmith urges that this statute precludes the remedy crafted by the trial court, the judge acknowledged that the instant case did not involve a "merger or asset sale, with the exclusive remedy available . . . [being] the statutory appraisal procedure." Supp. R. at 10. Inasmuch as no merger occurred here, the statutory dissenter's remedy could not properly be invoked. Moreover, there is nothing contained in the dissenter's right statute which would foreclose a buyout remedy for activities which effectively force one into a minority position and then destroy the value of an individual's stock. Thus, we reject Goldsmith's contention that a judicially ordered buyout of Boehm's shares was erroneous.[6] Additionally, we note that the trial court awarded Boehm $521,319 for his 34% interest in G & N, the value of which the court determined had been destroyed by Goldsmith and G & N's actions. In determining this amount, the court weighed the conflicting testimony of the parties' expert witnesses as to valuation of the G & N stock. To determine the damages for the lost value of Boehm's 34% interest, the court multiplied its total value for G & N—$1,533,291—by 34%, which yielded a figure of $521,319. The court also declined the defendants' invitation to apply a discount for Boehm's minority status and instead determined that the "fair value"[7] was the appropriate measure of the stock's value in light of Goldsmith's oppressive conduct that was established at trial. Similarly, the trial court rejected the "fair market valuation" of Boehm's minority interest because there was sufficient discord among shareholders to preclude the application of a minority discount to the valuation of Boehm's shares. Supp. R. at 10. Additionally, the testimony regarding the amounts Boehm paid for his stock were undisputed. Condon and Hunniford presented competing assessments of G & N's total value. Boehm testified that his stock no longer had any value, as no one would purchase his interest. Thus, the trial court simply weighed this evidence and determined the damages that were to be awarded. As a result, the record reflects that the trial court's findings and conclusions with regard to the lost value of Boehm's stock were supported by the evidence, and the trial court's award of damages was proper. See Potts v. Offutt, 481 N.E.2d 429, 434 (Ind.Ct.App.1985) (damage award is sustainable on appeal if supported by the evidence even though there is no specific degree of certainty).

### C. Liability Of G & N

■ G & N asserts that the judgment against it may not stand because Boehm's claims against it were in the nature of a direct action rather than a shareholders' derivative action. Specifically, G & N asserts that it did not owe Boehm a fiduciary duty and, therefore, the trial court could not order a buyout of Boehm's stock and cannot be liable for attorney fees or punitive damages.

■ It is well-settled that if corporate officers undertake action in their own interest and in a manner destructive of the corporation or the rights of other stockholders, they may be held accountable in the name of the corporation. First Merchants Nat. Bank & Trust Co. v. Murdock Realty Co., 111 Ind.App. 226, 238–39, 39 N.E.2d 507, 512 (1942). Their fraud in the course of the

---

**6.** We note that Settles v. Leslie, 701 N.E.2d 849 (Ind.App. 1998), reaffirmed the principle that I.C. § 23–1–44–8 provides the exclusive remedy for minority shareholders challenging a proposed merger. Unlike Settles, however, the proposed merger in the instant case was not consummated. Therefore, the operation of the sole remedy for minority shareholders who challenge a merger was not triggered here. See id., 701 N.E.2d at

———. Thus, the trial court was not precluded from ordering the buyout.

**7.** Fair value is the value of the stock of a closely held corporation valued as if 100% of the stock is being sold and where oppression of a minority shareholder exists. Supp. R. at 10.

corporate dealings is in law the fraud of the corporation. *Dorsey Mach. Co. v. McCaffrey*, 139 Ind. 545, 551, 38 N.E. 208, 210 (1894). Their acts are attributable to the corporation. *Hibschman Pontiac, Inc. v. Batchelor*, 266 Ind. 310, 315, 362 N.E.2d 845, 848 (1977). As this court recognized in *Griffin v. Carmel Bank & Trust Co.*, 510 N.E.2d at 183:

> Nothing ... is now more surely settled in the law of corporations than the doctrine that any unauthorized act or contract by the directors or a majority of the stockholders of a corporation, which will destroy [its] existence ... or render it unable to perform its functions or any misapplication or division of assets ... even though all other stockholders may consent, is a breach of a trust towards a dissenting stockholder, against which he is entitled to relief in equity.

In the instant case, the record reflects that Goldsmith sought to use G & N's cash flow in an effort to satisfy his personal obligations under the pretense of promoting G & N's business. For nearly three years, Goldsmith claimed that G & N was the "one corporation that held the necessary cash flow to fund a repayment plan for the existing debt owed to NBD by Paul Goldsmith." R. at 2176. Additionally, it was G & N which denied dividends to shareholders while paying Goldsmith a salary equivalent to his tax obligation. And it was the corporation that locked Boehm out even though he was a director.

The evidence also established that G & N began a systematic effort to freeze out and remove Boehm from the minority position which Goldsmith had forced upon him. For instance, Goldsmith, as G & N's president, wrote Boehm informing him that the company would provide no return on his investment in the foreseeable future, that the corporation sought his resignation, and that the company would consider merging with Goldsmith's other businesses to Boehm's detriment.

We note that G & N's attempt to avoid liability to Boehm because it "has not committed any tort[ious] action to reduce the value of Boehm's stock," *see* appellant's brief at 29–30, simply ignores the corporation's general obligation to operate in the interest of all shareholders. Moreover, G & N's argument that the corporation had no responsibility to Boehm for these actions because they were instigated by its president ignores the vicarious liability a corporation has for actions taken at its president's direction. *See Hibschman Pontiac, Inc.*, 266 Ind. at 315, 362 N.E.2d at 848 (agent's acts are attributable to corporation when done within the scope of their authority). Not only is G & N's corporate misallocation of assets subject to scrutiny, so are any corporate attempts to assist the majority in freezing out the minority. *See W & W Equip.*, 568 N.E.2d at 574–75.

All of the acts described above were not merely those of a shareholder. Rather, they were corporate acts which could expose G & N to liability. Goldsmith owed a fiduciary duty to Boehm, and G & N had a separate duty to remain independent in the closely held setting in which it existed. Boehm, as minority shareholder in G & N, may successfully assert a claim in order to protect the corporation from unlawful majority abuse. Although Boehm sought certain remedies in his derivative claims, he may also proceed with a direct action for his personal benefit against G & N as the minority interest in a closely held corporation.

As discussed in Subsection A, *supra*, our supreme court noted in *Barth II* that a trial court may, under certain circumstances, permit a direct claim by the minority shareholder against the corporation which necessarily bypasses the strict requirements set forth in I.C. § 23–1–32–1 *et seq. See Barth II*, 659 N.E.2d at 562. This court was recently called upon to revisit the circumstances presented in *Barth I* and *II*, following the trial court's dismissal of the minority shareholder's direct claims against the corporation and its majority shareholder for breach of fiduciary duty. *Barth v. Barth*, 693 N.E.2d 954, 955–56 (Ind.Ct.App.1998) (*Barth III*). In *Barth III*, we determined that the trial court did not abuse its discretion in dismissing the complaint because the evidence revealed that the direct action did not satisfy the requirements set forth in *Barth II*. Specifically, we

upheld the trial court's conclusion that there was a potential for a multiplicity of shareholder suits, that the interests of creditors were potentially prejudiced by the dissolution of the corporation and, finally, that any recovery to the plaintiff individually would necessarily endanger the non-party shareholder's right to a fair recovery if a direct action was permitted to proceed. *Id.* at 958–59.

Unlike our conclusion in *Barth III*, the circumstances presented here do not warrant a similar result. As previously discussed, the only other minority shareholder of G & N was Goldsmith's son, Greg. His 6 and 2/3% interest of the outstanding shares in G & N compared to Boehm's 34% interest, amounted to a relatively minute share of the earnings. Additionally, Greg's interest conflicted with that of Boehm, and there was no evidence demonstrating that he might have pursued a cause of action against Goldsmith. Finally, the evidence showed that G & N's sales averaged $5 million with net annual profits amounting to nearly $228,000. Thus, the evidence did not establish that Boehm's direct action would have materially prejudiced G & N's creditors. As a result, we find no abuse of the trial court's discretion in permitting Boehm to seek recovery in a direct action against G & N. Moreover, the evidence presented here established that G & N took actions inimical to its interests and then attempted to freeze out Boehm as the objecting minority. Thus, the evidence supported the trial court's findings and conclusions that G & N breached a fiduciary duty owed to Boehm.

### D. Damages—G & N

■ G & N also argues that the damage award may not stand. Specifically, it asserts that it cannot be held liable for the board's decision to withhold the 1994 and 1995 payment of dividends because the evidence established that the corporation simply could not afford to pay them, and that G & N could not be required to distribute 34% of its corporate income to Boehm.

Here, the record reflects that the trial court awarded damages equal to Boehm's pro-rata share of G & N's 1994 and 1995 net income, plus 34% of the corporation's net income until the transfer of the shares to Goldsmith was effected. This award was made in accordance with the figures set forth in Boehm's tax forms which were admitted at trial. R. at 2031–35. To prove damages, Boehm presented evidence at trial that Goldsmith's stated reasons for the withholding of income distributions—paying down G & N's bank loan and purchasing new equipment for G & N—had not been acted upon. Although Hunniford, the accountant that Goldsmith had retained, testified that G & N could not afford to distribute the net income, the trial court considered the testimony, weighed the evidence and concluded that there was no valid reason for the withholding of the income distributions. Moreover, it is apparent that such an award was for the ongoing injury sustained by Boehm which simply served as a mechanism to enforce the court's order that G & N and Goldsmith purchase Boehm's stock. As a result, we cannot say that the record is devoid of facts or inferences to support the trial court's finding as to the amount of Boehm's damages. *See W & W Equip.*, 568 N.E.2d at 577 n. 7 (trial court is vested with discretionary power to award damages in order to do complete justice and may adjust remedies in order to grant the necessary relief). Thus, the damage award to Boehm is supported by the evidence presented at trial and we will not set aside that award.

### III. Summary Judgment

G & N next contends that the trial court erred in granting summary judgment for Boehm with respect to its counterclaim which alleged that Boehm's cause of action was groundless or frivolous. Specifically, G & N claims that the trial erred because the designated evidence established that it was compelled to defend against Boehm's groundless claims. Appellant's brief at 41.

In reviewing the trial court's grant of summary judgment, this court stands in the shoes of the trial court, applying the same standards in deciding whether to affirm or reverse summary judgment. *Smith v. Allstate Ins. Co.*, 681 N.E.2d 220, 223 (Ind.Ct. App.1997). We do not weigh evidence, but will liberally construe the facts in the light

most favorable to the nonmoving party. *General Motors Corp. v. Northrop Corp.*, 685 N.E.2d 127, 132 (Ind.Ct.App.1997), *trans. denied.* Summary judgment should be granted only when the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Ind.Trial Rule 56(C). On appeal, we must determine whether there is a genuine issue of material fact and whether the law has been correctly applied by the trial court. *City of Elkhart v. Agenda: Open Government, Inc.*, 683 N.E.2d 622, 625 (Ind.Ct.App. 1997), *trans. denied.* The party appealing the grant of summary judgment has the burden of persuading this court on appeal that the trial court's ruling was improper. *Jordan v. Deery*, 609 N.E.2d 1104, 1107 (Ind. 1993).

This court has determined that each party to litigation is generally responsible for payment of his own attorney fees unless a claim is frivolous, unreasonable, groundless, or litigated in bad faith. *Kovenock v. Mallus*, 660 N.E.2d 638, 643 (Ind.Ct.App.1996), *trans. denied;* IND. CODE § 34–1–32–1.[8] A claim is "frivolous" if established that it was brought for the purpose of an improper motive such as harassment or if legal counsel is unable to make a good faith, rational argument on the merits of the case. *Kahn v. Cundiff*, 533 N.E.2d 164, 170 (Ind.Ct.App. 1989). Additionally, we have considered a claim "groundless" only if no facts exist which support a legal claim presented by the losing party. *Brant v. Hester*, 569 N.E.2d 748, 754 (Ind.Ct.App.1991). In the event the trial court has determined that a claim has a reasonable likelihood of success on the merits, the claim cannot be frivolous or groundless as a matter of law. When addressing a party's motion for a preliminary injunction, such a determination must be made. *L.E. Services, Inc. v. State Lottery Comm'n*, 646 N.E.2d 334, 349 (Ind.Ct.App.1995), *trans. denied.*

In the instant case, we note that G & N's counterclaim filed on October 16, 1995 sought attorney fees from Boehm because he instituted and maintained a frivolous action against it. Specifically, the counterclaim alleged that Boehm was attempting to force G & N to make improper dividend distributions or force the remaining stockholders to purchase his interest at an excessive value. R. at 229. Prior to the filing of the counterclaim, however, Boehm filed a motion for a preliminary injunction on June 27, 1995, to enjoin G & N from "holding a Board of Directors meeting to change the officers or change the by-laws or take any other action which would redirect the corporation in its operations or management ..." R. at 264. Following a three-day hearing on Boehm's motion, the trial court granted the requested injunctive relief on August 10, 1995. Specific findings of fact and conclusions of law were entered which determined, *inter alia,* that Goldsmith breached his fiduciary duty to Boehm when he evicted G & N from its current location in an attempt to coerce the other shareholders to sell their shares of stock, and that the actions were calculated to temporarily reduce the value of certain stock so that he could acquire it which, therefore, demonstrated that he was advancing personal interests to Boehm's detriment. R. at 275. In light of the trial court's grant of the motion for the preliminary injunction, the trial court necessarily determined that Boehm had at least a reasonable likelihood of success on the merits. As a result, the preliminary ruling was dispositive of the issue as to whether Boehm's claim was frivolous or groundless. Therefore, the trial court properly granted summary judgment to Boehm with respect to G & N's counterclaim.[9]

### IV. Attorney Fees

G & N and Goldsmith next argue that the award of attorney fees to Boehm was erroneous. Specifically, they contend

---

8. Amended and recodified at IND. CODE § 34–52–1–1.

9. We also note that because G & N chose to assert its counterclaim against Boehm nearly two months after the trial court had issued the injunction, it was appropriate for the trial court to determine that G & N's counterclaim was groundless and, therefore, entitled Boehm to recover his costs and attorney fees in defending that claim.

that Boehm may not recover his attorney fees because he pursued only a direct shareholder's action against them and such fees are not awardable in actions involving the breach of a fiduciary duty.

▇▇▇▇ Generally, attorney fees are not recoverable as damages in the absence of a statute, rule or a contract stipulating the recovery of such fees. *City of Hammond v. Marina Entertainment Complex, Inc.*, 681 N.E.2d 1139, 1142 (Ind.Ct.App.1997), *trans. denied.* While a shareholder has the right to recover attorneys' fees from the corporation in a derivative claim, each party is normally responsible for his own legal expenses in a direct action. *DRW Builders, Inc. v. Richardson*, 679 N.E.2d 902, 909 (Ind.Ct.App. 1997); *Barth*, 659 N.E.2d at 563.

In the instant case, the trial court's order with respect to the award of attorney fees is as follows:

> The Court further concludes that Plaintiff, Erich Boehm is entitled to recover his attorney fees in this action. The Court orders that counsel for Plaintiff, Erich Boehm, submit to the court a detailed time record, copies of any fee agreement entered into with Erich Boehm and any other documents related to attorney fees and to serve copies of same on opposing counsel.

Supp. R. at 14.

In light of this order, G & N and Goldsmith both assert that Boehm is not entitled to his attorney fees because he only pursued a direct action against them and points to *DRW Builders* in support of this proposition. In that case, Richardson, the minority shareholder, instituted a derivative action against the majority shareholders and the corporation after it had become insolvent. *Id.* at 905. Following a bench trial, judgment was entered in favor of the plaintiff. A portion of the damages that were awarded included an order that the majority shareholders pay the plaintiff's attorney fees. *Id.* On appeal, this court reversed the award of attorney fees and held that "Although Richardson is entitled to reimbursement for attorneys' fees on his derivative claim, those fees must be assessed against DRW and not the [majority shareholders]." *Id.* at 909.

As the plaintiff in *DRW* was precluded from recovering an award of attorney fees against the individual shareholders in the derivative action, the trial court here simply permitted Boehm's derivative claims against G & N to proceed as a portion of his direct action because it found that the factors set forth in *Barth* had been satisfied. Therefore, while neither *Barth* nor *DRW* prevent the trial court from ordering G & N to reimburse Boehm for attorney fees, an order directing Goldsmith to pay those fees may not stand. Thus, we remand this case to the trial court for an entry of judgment entitling Boehm to recover such fees only from G & N. On remand, the trial court is also directed to compute that portion of attorneys' fees attributable only to Boehm's derivative claims and to amend the amount of the attorney fee award accordingly.

## V. *Punitive Damages*

Goldsmith next contends that Boehm is not entitled to punitive damages. Specifically, he claims that because the award of compensatory damages was erroneous, Boehm is precluded from recovering any amount for punitive damages. In support of his position, Goldsmith reasserts the arguments that we have already addressed to the extent that the trial court erred in concluding that "Goldsmith had been involved in any completed act constituting a breach of a fiduciary duty, or that any act or omission of his caused harm." *See* Appellant's brief at 53.

▇▇▇▇ In addition to our determination that the trial court properly concluded that Goldsmith is liable to Boehm for a breach of a fiduciary duty, we note that punitive damages may be awarded where there is clear and convincing evidence that the defendant acted with malice, fraud, gross negligence or oppressiveness which was not the result of a mistake of fact or law, honest error of judgment, overzealousness, mere negligence, or other human failing, in a sum that will serve to punish the defendant and to deter him, and others, from like conduct in the future. *Erie Ins. Co. v. Hickman*, 622 N.E.2d 515, 520 (Ind.1993). In reviewing an award of punitive damages, we consider the nature of the tort, the extent of actual damages sus-

tained and the economic wealth of the defendant. *Arlington State Bank v. Colvin,* 545 N.E.2d 572, 580 (Ind.Ct.App.1989), *trans. denied.* To vacate an award of punitive damages as excessive, the award must clearly appear to have been the result of passion or prejudice. *Id.* We will sustain the award so long as the judgment is sustained by substantial evidence of probative value. *W & W Equip.,* 568 N.E.2d at 577.

In the instant case, the trial court made the following finding with respect to the award of punitive damages:

> [T]hat Paul Goldsmith, in secretly plotting to force other shareholders to sell him their stock in G & N and to take over G & N for his personal benefit and for the benefit of his other business entities, acted with malice, fraud and oppression which was not the result of mistake of law or fact or an honest error of judgment, overzealousness or other human failings. Every step of the take-over plot included professional advice from attorneys or accountants. Therefore it is clear that Defendant, Paul Goldsmith was acting intentionally. Additionally, even after a preliminary [in]junction was issued, Defendant, Paul Goldsmith continued with his plot to use G & N's profitability to benefit himself and his other business entities to the detriment of the other shareholders of G & N. The Court concludes the Plaintiff, Erich Boehm should receive a judgment against Paul Goldsmith individually for punitive damages in the amount of $175,000.00.

Supp. R. at 14.

Our review of the record supports the trial court's findings and conclusions that Goldsmith deliberately acted, over a period of time, to relegate Boehm to a minority position and effectively "freeze" Boehm out through a denial of dividends. The evidence also showed that Goldsmith's plan to merge G & N with his other companies to Boehm's further detriment continued even after Boehm filed his complaint and after the trial court entered a preliminary injunction prohibiting such conduct. In light of this evidence, we cannot say that the trial court erred in concluding that Goldsmith's conduct

was oppressive and malicious for the reasons that have been thoroughly discussed. As a result, the trial court could conclude that Goldsmith's scheming and attempts to remove Boehm constituted intentional and flagrant violations of his fiduciary duty to Boehm. Thus, the award of punitive damages in Boehm's favor was proper.

### CONCLUSION

In light of our resolution of the issues above, we conclude that the trial court correctly found G & N and Goldsmith liable for breach of a fiduciary duty owed to Boehm and that the amount awarded to Boehm for compensatory damages was proper. We also note that the trial court properly entered summary judgment for Boehm with respect to G & N's counterclaim and sustain the award of punitive damages against Goldsmith. Finally, we conclude that while Boehm may recover attorney fees from G & N as to his derivative claims, he is not entitled to an award of attorney fees from Goldsmith with respect to his direct action.

The judgment is affirmed but we remand this cause for the trial court to compute the amount of attorney fees that Boehm may recover from G & N with respect to his derivative claims.

DARDEN and BAILEY, JJ., concur.