G & N AIRCRAFT, INC. and
Paul Goldsmith, Appellants
(Defendants Below),

v.

Erich BOEHM, for himself and as minority shareholder of G & N Aircraft, Inc., Appellee (Plaintiff Below).

No. 45S05–0003–CV–221.

Supreme Court of Indiana.

March 2, 2001.

Gilbert F. Blackmun, Leonard M. Holajter, Highland, IN, Nana Quay–Smith, Karl L. Mulvaney, Candace L. Sage, Indianapolis, IN, Samuel T. Miller, Munster, IN, Attorneys for Appellants.

Paul A. Rake, Gregory A. Crisman, John P. Twohy, Hammond, IN, Attorneys for Appellee.

## ON PETITION FOR TRANSFER

BOEHM, Justice.

This case deals with the obligations of a majority shareholder in a close corporation and the remedies available to a minority shareholder for breach of those duties.

### Factual and Procedural Background

G & N Aircraft, Inc., is an Indiana corporation engaged in overhauling and rebuilding piston engines for aircraft. G & N was founded in 1962 by Paul Goldsmith and Ray Nichols. By the early 1990s, G & N was owned 34% by Erich Boehm, 26% by Goldsmith, 16 2/3% each by Richard Gilliland and James McCoy, and 6 2/3% by Greg Goldsmith, Goldsmith's son. Goldsmith served as the president, Boehm as the vice-president, and Gilliland as the secretary of the corporation. Both Goldsmith and Boehm were employees of G & N. The board of directors consisted of the five shareholders.

G & N operated its business in a hangar at Griffith Airport owned by Goldsmith individually. Its principal supplier of engine parts was Edgecumbe G & N, Inc., which was owned by Goldsmith, Gilliland, and McCoy. G & N's annual sales were on the order of $5 million and its annual net profit was approximately $220,000.

Goldsmith was the sole owner of several other aviation-related corporations. None of these was profitable, and one was in default on a $1.2 million loan that Goldsmith had guaranteed personally. Goldsmith began to explore means of paying down the loan and was told by his tax advisor that if he became the sole owner of G & N and converted it from a Subchapter S corporation to a C corporation, G & N could shelter its operating income and thereby increase its cash flow by taking advantage of $1.8 million in operating loss carryforwards of the other companies. In 1994, Goldsmith began negotiating with a bank to finance his acquisition of all of G & N. He obtained an appraisal of G & N's shares from its corporate counsel and accountant that valued the corporation at $961,000. Goldsmith approached Gilliland and McCoy about selling their shares, but his loan application was rejected and no

transactions were consummated at that time.

Approximately one year later, Goldsmith renewed his efforts to consolidate G & N, which was still profitable, with his other companies. In negotiations and letters detailing his plans to the bank, Goldsmith expressed his desire to buy out Boehm and the other shareholders, convert G & N to a C corporation, and then merge the companies to take advantage of the tax loss carryforwards. He also detailed plans to use his control of G & N and his position as landlord of the hangar to coerce his fellow shareholders to sell their G & N stock. He believed he could force all of the other G & N shareholders to sell their interests by increasing G & N's rent at the hangar from $6,500 per month to $30,000, which would raise the prospect of an expensive relocation. Goldsmith also believed that if he threatened to eliminate Edgecumbe as G & N's supplier, he could force Gilliland and McCoy to sell their G & N shares to preserve the value of their holdings in Edgecumbe.

On April 26, 1995, Goldsmith offered Boehm $200,000 for his 34% interest in G & N. Boehm refused to sell. Two days later, Goldsmith sent Boehm a notice of his resignation as president of G & N. Acting as landlord of the hangar, Goldsmith accompanied the notice with an eviction notice giving G & N thirty days to vacate its facilities. On May 1, Gilliland and McCoy agreed to trade their G & N shares to Goldsmith for Goldsmith's holdings in Edgecumbe. Both selling shareholders retained their positions on the G & N board of directors. As a result of these transactions, Goldsmith owned 59 1/3% of G & N's shares, Greg owned 6 2/3% and Boehm 34%. At a board meeting on May 22, 1995, Boehm proposed alternate locations for G & N's operations, which were rejected by the board. In that same meeting, the board reelected Goldsmith as the president of G & N by a three to one vote, with Boehm dissenting.

The board met again on June 14, 1995 to discuss the dividend for 1994. For many years, G & N had declared annual dividends in the amount of its net profits for the preceding calendar year. Because its cash flow in 1993 was inadequate to distribute its entire net profit for that year, the company had taken out a $300,000 bank loan to pay its dividend. By the spring of 1995, as a result of this borrowing and obligations to trade creditors, Matt Hunniford, Goldsmith's personal accountant, determined that G & N was not in a financial position to distribute the 1994 earnings as a dividend. No dividend was declared. At the same meeting, the board also discussed the possibility of relocating G & N. Goldsmith expressed the view that this might have "negative effects," and withdrew his notice of eviction.

One week later, Goldsmith wrote Boehm a letter demanding that Boehm sell his stock in G & N to Goldsmith for $250,000. The letter stated that if Boehm did not sell his stock, as a shareholder he would suffer the consequences of Goldsmith's merger plan, which included capital outlays that would preclude dividends for at least three years. In this letter, Goldsmith also asked for Boehm's resignation as vice president and as a board member and demanded that Boehm vacate his office and remain off the premises. When Boehm refused Goldsmith's offer, Goldsmith changed the locks on Boehm's office. He then fired G & N's bookkeeper and transferred G & N's accounting function to employees of one of Goldsmith's businesses.

On June 27, 1995, Boehm filed a complaint against Goldsmith and G & N asserting both shareholder derivative claims and direct claims for breach of fiduciary duty. Boehm alleged that G & N was purposefully reducing its profitability and was not maximizing long-run returns for its owners. On August 10, 1995, Boehm obtained a preliminary injunction and thirteen days later amended his complaint to include claims of Goldsmith's conflicts of interest, breach of Goldsmith's fiduciary

duties to G & N and to Boehm, and breach of shareholder agreements by Goldsmith, Gilliland, and McCoy.

Goldsmith and G & N responded by asserting that Boehm had failed to comply with the requirements of Trial Rule 23.1 for a shareholder derivative action. G & N also filed a counterclaim for attorney's fees, claiming that Boehm's lawsuit was frivolous. Boehm dismissed his claims against Gilliland and McCoy and, on July 31, 1996, sought summary judgment on G & N's counterclaim against him. Goldsmith and G & N filed cross-motions for summary judgment.

The trial court denied Goldsmith's and G & N's motions for summary judgment after finding that there were genuine issues of material fact. The trial court granted Boehm's motion for summary judgment as to G & N's counterclaim and ordered G & N to pay Boehm's costs and attorney's fees after finding the counterclaim baseless. After a four-day bench trial, the trial court entered judgment directing G & N and Goldsmith to pay $521,319 in exchange for Boehm's G & N stock. The court also awarded Boehm damages of $173,939 for back dividends, plus any future dividends until the sale was closed, $175,000 in punitive damages, and attorney's fees. The Court of Appeals affirmed the judgment, but noted that Boehm could recover attorney's fees only for his derivative claims, and not his claims as a minority shareholder. *G & N Aircraft, Inc. v. Boehm,* 703 N.E.2d 665, 680 (Ind.Ct.App.1998).

### Standard of Review

■ Where, as here, a trial court has made special findings pursuant to a party's request under Indiana Trial Rule 52(A), the reviewing court may affirm the judgment on any legal theory supported by the findings. *Mitchell v. Mitchell,* 695 N.E.2d 920, 923 (Ind.1998). "[T]he court on appeal shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." T.R. 52(A). When the

specific issue on review relates to the award of damages, a damage award should not be reversed if it is within the scope of the evidence before the trial court. *Dunn v. Cadiente,* 516 N.E.2d 52, 54 (Ind.1987).

## I. Derivative and Direct Actions

As a threshold matter, Boehm asserted both shareholder derivative claims and also direct claims of breaches of duty to him as a shareholder. Some claims are against G & N, and some against Goldsmith personally. The trial court entered judgment against both defendants. One or both were ordered to purchase Boehm's G & N shares. Damages for interim cash shortfalls were also awarded against G & N, and punitive damages of $175,000 were awarded against Goldsmith. This presents quite an assortment of claims and remedies that requires some sorting out.

### A. Direct v. Derivative Actions

■ A direct action is "[a] lawsuit to enforce a shareholder's rights against a corporation." *Black's Law Dictionary* 472 (7th ed.1999). This action may be brought in the name of the shareholder "to redress an injury sustained by, or enforce a duty owed to, the holder." 2 *Principles of Corporate Governance* § 7.01, at 17 (A.L.I. 1994). Direct actions are typically appropriate to enforce the right to vote, to compel dividends, to prevent oppression or fraud against minority shareholders, to inspect corporate books, and to compel shareholder meetings. *Id.*

■ Derivative actions, on the other hand, are suits "asserted by a shareholder on the corporation's behalf against a third party ... because of the corporation's failure to take some action against the third party." *Black's* at 455. They are brought "to redress an injury sustained by, or enforce a duty owed to, a corporation." A.L.I. at 17. Derivative actions are brought in the name of the corporation and are governed by Trial Rule 23.1 and Indiana Code section 23–1–32–1. To bring

a derivative action a shareholder must satisfy four requirements. They are: (1) the complaint must be verified; (2) the plaintiff must have been a shareholder at the time of the transaction of which he complains; (3) the complaint must describe the efforts made by the plaintiff to obtain the requested action from the board of directors; and (4) the plaintiff must fairly and adequately represent the interests of the shareholders. Examples of actions that are typically required to be brought derivatively include actions to recover for loss of a corporate opportunity, to recover corporate waste, and to recover damages to a corporation caused by an officer or director's self-dealing.

Some courts and commentators, and indeed the defendants in this case, would distinguish between direct and derivative actions based on whether the shareholder or the corporation has been injured. John W. Welch, *Shareholder Individual and Derivative Actions: Underlying Rationales and the Closely Held Corporation*, 9 J. Corp. L. 147, 154–57 (1984). Under this view, if only the interests of the corporation are directly damaged, then the suit must be derivative. The difficulty in this approach is that, in many cases, it is entirely unclear whether there has been direct damage to the shareholders or the corporation or both.[1]

Some courts allow a direct action only if the shareholder's injury is distinct from the injuries sustained by other shareholders and the corporation. Welch at 162. This is also problematic because some injuries may run to all shareholders—for example, refusal to convene an annual meeting—and be caused by a breach of the duty owed to every shareholder.

Still other courts take a categorical approach to distinguishing between direct and derivative lawsuits and look to past judicial decisions to label a claim as either direct or derivative depending on what previous courts have done in awarding the requested relief. *Id.* at 157–59; *accord* Tim Oliver Brandi, *The Strike Suit: A Common Problem of the Derivative Suit and the Shareholder Class Action*, 98 Dick. L.Rev. 355, 359 (1994). There are two drawbacks to this approach. First, earlier courts may have incorrectly classified a particular type of action. Second, shareholders may have different rights depending on the specific terms of the articles, bylaws, and agreements of the corporation.

■ We believe that the correct approach draws the distinction based on the rights the shareholder asserts. Under this view, a direct action may be brought when: ·

> it is based upon a primary or personal right belonging to the plaintiff-stockholder.... It is derivative when the action is based upon a primary right of the corporation but which is asserted on its behalf by the stockholder because of the corporation's failure, deliberate or otherwise, to act upon the primary right.

*Schreiber v. Butte Copper & Zinc Co.*, 98 F.Supp. 106, 112 (S.D.N.Y.1951). The rights of a shareholder may be derived from the articles of incorporation and bylaws, state corporate law, or agreements among the shareholders or between the corporation and its shareholders. Welch at 160. If none of these establishes a right in the shareholders to the requested relief, the claim, if it exists at all, must be brought on behalf of the corporation in a derivative action.

1. This is particularly true of close corporations. This case presents a good example. One act complained of is a coerced sale of Gilliland's and McCoy's shares through misuse of Goldsmith's corporate office. Assuming for the moment that this asserts a claim, in some sense, G & N is the injured party. To the extent a value (the premium attributable to majority shareholding) has been acquired by use of a corporate office, it can be viewed as an appropriation of an asset that rightfully belongs to the corporation. And to the extent operational disadvantage is a result of the threatened or consummated termination of Edgecumbe, G & N is injured. But it is equally valid to view Boehm as the injured party by reason of having been reduced from a plurality to a minority. *See infra* Part II.C.1.

## B. *Barth v. Barth*

The distinction between direct and derivative actions has been complicated in more recent years by recognition in many jurisdictions, including Indiana, of direct actions by shareholders in close corporations for derivative claims. In 1995, this Court held that a shareholder in a close corporation need not always bring claims of corporate harm as derivative actions. Rather, in such an arrangement, the shareholders are more realistically viewed as partners, and the formalities of corporate litigation may be bypassed. *Barth v. Barth*, 659 N.E.2d 559, 561 & n. 6 (Ind. 1995). The Court, following the American Law Institute's Principles of Corporate Governance section 7.01(d), held that a shareholder of a close corporation may proceed against a fellow shareholder in a direct action if that form of action would not: (1) unfairly expose the corporation or the defendants to a multiplicity of actions, (2) materially prejudice the interests of creditors of the corporation, or (3) interfere with a fair distribution of the recovery among all interested persons. *Id.* at 562. The Court reasoned that "shareholders of closely-held corporations have very direct obligations to one another and ... shareholder litigation in the closely-held corporation context will often not implicate the principles which gave rise to the rule requiring derivative litigation...." *Id.* Specifically, requiring a demand on the board and awarding the recovery to the corporation may not be appropriate in a close corporation where there are only two shareholders, and one owns a majority of the stock and controls the board.[2] Also, under these circumstances, the special committee proceeding contemplated by Indiana Code section 23–1–32–4 is often unavailable because there are typically no disinterested directors.

## II. Claims against Goldsmith

Boehm alleged that Goldsmith, while acting as president and/or majority shareholder of G & N: (1) provided advantages to his other corporations that had no benefit to G & N; (2) refused to find a different location for the corporation due to his conflicted position as landlord; (3) chose bad accounting and tax policies; (4) attempted to combine G & N with his other businesses without any benefit to G & N; (5) paid too much for parts from Edgecumbe due to his position as an owner of Edgecumbe; (6) wasted corporate assets; (7) breached his fiduciary duties to the corporation; (8) transferred corporate assets for personal benefit; (9) breached his fiduciary duties to Boehm by attempting to coerce a sale of Boehm's G & N stock; and (10) accomplished a de facto merger of G & N without providing dissenter's rights. Atypically, this case does not involve any claim that Boehm's employment was wrongfully terminated.

Boehm's claims fall into three basic categories: (1) Goldsmith as an officer and director breached his fiduciary duties to the corporation; (2) Goldsmith as an officer and director breached his fiduciary duties to Boehm as a shareholder; and (3) Goldsmith as a majority shareholder in a closely held corporation breached his fiduciary duties to Boehm. The trial court determined that Goldsmith "breached his fiduciary duties to the corporation and his fellow shareholders by pursuing his own personal interests at the expense of G & N," but did not differentiate the capacity in which Goldsmith acted or specify which duties to whom were breached. For the reasons explained below, we agree with the trial court's basic holding that the facts as found support a direct action by Boehm against Goldsmith.

2. Some corporate statutes and courts have attempted to define "close corporation." Because G & N had only three shareholders and one of those is Goldsmith's son, it falls clearly on the close corporation side of any line, bright or fuzzy. A minimum requirement is a lack of a public market for the shares, and most would require a small number of shareholders as well. *Melrose v. Capitol City Motor Lodge, Inc.*, 705 N.E.2d 985, 990 (Ind.1998).

## A. *Boehm's Direct Action*

■ To the extent Boehm claims that Goldsmith as an officer and director breached his fiduciary duties to the corporation in the various transactions, these allegations assert largely derivative claims. The facts asserted in the items numbered one through eight above show these claims to be based on actions Goldsmith took as an officer or director of G & N. These claims, at least in broad brush, assert breaches of duties owed to the corporation, not to Boehm. As such, they must satisfy the requirements of Trial Rule 23.1 for a derivative action unless they fall under the *Barth* exception for close corporations.

■ Goldsmith contends that the trial court erred by allowing Boehm to proceed with his claims for harm against the corporation without complying with all the dictates of Trial Rule 23.1. Although Boehm did not file a verified complaint, eight days after filing his complaint, he filed an affidavit affirming the allegations of the complaint under penalty of perjury. We think this satisfies the verification requirement in substance. As for the demand for director action, Boehm pleaded that a demand was useless. Goldsmith contends that this was insufficient to satisfy Trial Rule 23.1 because Boehm did not describe his efforts with particularity to obtain the action he wanted. Generally, a conclusory allegation of futility of a demand is insufficient to satisfy this requirement. Here, however, the majority shareholder and director is the defendant. Under these circumstances, Boehm's allegation appears to be sufficient. *See Perlman v. Feldmann*, 129 F.Supp. 162, 194 (D.Conn.1952), *reversed on other grounds*, 219 F.2d 173 (2d Cir.1955); *Wayne Pike Co. v. Hammons*, 129 Ind. 368, 375–76, 27 N.E. 487, 489–90 (1891).

■ The propriety of a derivative claim is largely academic because the relief ordered by the trial court was awarded directly to Boehm, not to G & N. However, under the facts in this case, it appears that the *Barth* exception applies and Boehm was properly allowed to proceed with his claims for corporate harm as direct actions. *See Barth v. Barth*, 659 N.E.2d 559, 562 (Ind.1995). Goldsmith argues that the *Barth* factors are not satisfied because there were five shareholders at the time of some of his actions. Goldsmith argues that a direct action would contravene the *Barth* stricture against creating the threat of multiple litigation. Gilliland and McCoy were shareholders at the time of some of Goldsmith's actions, but have since sold their shares to Goldsmith. Although it is not explicit in the Rule, we think "shareholder" in Trial Rule 23.1 means "current shareholder as of the time of the suit." The plaintiff shareholder must "fairly and adequately represent the interests of the shareholders." T.R. 23.1. Because Gilliland and McCoy were not shareholders at the time of all actions complained of, and sold their shares under pressure, their interests as of the time of suit were quite different from Boehm's. At the least, a derivative recovery would require extensive additional relief to place those two in the same position as Boehm vis-à-vis any benefit obtained for G & N. Because these former shareholders do not fairly and adequately represent current shareholders, they are not potential derivative plaintiffs and are limited to whatever claim they have as individuals. As a result, permitting Boehm to proceed individually does not multiply litigation beyond the lawsuits already inherent in the situation.

■ Goldsmith also contends that if the judgment stands, G & N has creditors who will go unpaid based on the corporation's current ability to pay. Goldsmith claims that G & N will be unable to pay Boehm, its bank debt, and its trade creditors, and notes that G & N has taken out loans in order to distribute cash equal to its profits and also to cover working capital. The trial court found that allowing Boehm to proceed with a direct action would "not materially prejudice the inter-

ests of creditors." It also observed that "ANB Bank is the only major creditor of G & N and the debt owed is approximately $200,000.00, substantially less than the value of G & N." The amount of debt is apparently in dispute, but we cannot conclude that the finding of lack of prejudice to creditors was clearly erroneous. Moreover, as explained in Part III, the recovery for any breach of fiduciary duty comes from Goldsmith, not G & N. To the extent Goldsmith, as a shareholder, is forced to draw on G & N's resources to pay the judgment, normal corporate protections should be available to prefer G & N's creditors over distributions or payments from G & N to Goldsmith to pay Boehm.

In sum, the reasons for requiring a shareholder to pursue claims as a derivative action are not present in this case. The plaintiff is one of three shareholders. Of the three, only Boehm is complaining. The other two are a father, owning a majority, and his son, with a small percentage. There is thus no potential for a multiplicity of shareholder suits. There is also no evidence of any creditor in need of protection, and there is no concern that Boehm's recovery will interfere with a fair distribution of the benefits of the suit. Because none of the underlying reasons for requiring a derivative action are present here, we hold that Boehm was not required to bring a derivative action.

### B. *Claims of Breach of Duties to G & N*

Boehm's claims for breach of Goldsmith's fiduciary duties to the corporation can be divided into three categories: self-dealing, corporate waste, and use of corporate office to achieve personal objectives. Although directors must act with absolute good faith and honesty in corporate dealings, *Schemmel v. Hill,* 91 Ind.App. 373, 385–86, 169 N.E. 678, 682–83 (1930), Indiana Code section 23–1–35–1(e) provides that:

[a] director is not liable for any action taken as a director, or any failure to take action, unless: (1) the director has breached or failed to perform the duties of the director's office in compliance with this section; and (2) the breach or failure to perform constitutes willful misconduct or recklessness.

■■■ In other words, Indiana has statutorily implemented a strongly pro-management version of the business judgment rule. A director is not to be held liable for informed actions taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes. The rule includes "a presumption that in making a business decision, the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." ·*Aronson v. Lewis,* 473 A.2d 805, 812 (Del.1984), *overruled on other grounds by Brehm v. Eisner,* 746 A.2d 244 (Del.2000). By statute, negligence is insufficient to overcome the presumption; recklessness or willful misconduct is required.

■■■ Boehm first claims that Goldsmith paid too much for Edgecumbe's parts and transferred corporate assets for personal gain. In this case, the shareholders knew of Goldsmith's connection with Edgecumbe and appear to have approved the deals, over Boehm's objections. We think ratification by formal vote is not required for a corporation with only a few shareholders, and in which all the shareholders are involved in management and are clearly aware of the material facts over a period of years. Finally, it is irrelevant whether Goldsmith's action as a shareholder is necessary for ratification. Indiana law specifically permits a shareholder-director to vote as a shareholder in his own interest despite any conflict. Ind.Code § 23–1–35–2(d) (1998). The transactions were not voidable solely by reason of Goldsmith's and others' interest in the deal.[3]

---

3. Under Indiana Code section 23–1–35–2(a), a transaction is not voidable "solely because of"

There remains the question whether a transaction that is not voidable "solely" by reason of a conflict nevertheless can be the basis of director liability. As the Court observed in *Melrose v. Capitol City Motor Lodge, Inc.*, 705 N.E.2d 985, 991 (Ind. 1998), "The interrelationship between the conflict of interest statute and the common law of fiduciary duty in close corporations has not been the subject of judicial attention in Indiana." The Court went on to imply that a breach of fiduciary duty claim may nevertheless lie to attack a transaction that has been ratified. In evaluating a claim of breach of duty in a close corporation, the Court upheld the challenged transaction because "(1) the material facts of the transaction and [the director's] interest were disclosed or known to [the minority], (2) the requisite corporate formalities necessary to authorize, approve, or ratify the transaction were followed, and (3) the transaction was fair to the corporation." *Id.* The third requirement, fairness to the corporation, is essential under these circumstances. Put simply, it is a breach of the majority shareholder's fiduciary duty to cause the corporation to enter into an unfair transaction to the personal advantage of the majority shareholder. To the extent G & N overpaid for parts, this would state a claim. However, the trial court attributed no damages to this claim, and made no finding that the parts were overpriced. Thus, although this was an issue debated by both parties, it leads nowhere in this case.

■■■ Boehm next claims that Goldsmith wasted corporate assets. More specifically, he argues that Goldsmith's salary of $65,000, an amount equivalent to his tax liability, was a waste of corporate assets. "The standard of proof in compensation cases requires a plaintiff shareholder to show the compensation is unjust, oppressive, or fraudulent." *Krukemeier v. Krukemeier Mach. & Tool Co.*, 551 N.E.2d 885,

888 (Ind.Ct.App.1990); *Green v. Felton*, 42 Ind.App. 675, 688, 84 N.E. 166, 170 (1908). This action was also covered by the business judgment rule. Sixty-five thousand dollars is hardly excessive for the president of a corporation of this size and Boehm offers nothing to overcome the presumption of validity that attaches to a director's actions, or to prove that the compensation is "unjust, oppressive, or fraudulent." Thus, we have no evidence that the value of the corporation reflected in the purchase price ordered by the trial court was deflated by excessive salaries. It appears Boehm's real complaint is not that Goldsmith's salary was excessive, but rather that his own was cut off.

■■ Boehm's final claims involve allegations that Goldsmith refused to find alternate locations for G & N, chose bad accounting and tax policies, and attempted to combine G & N with his other businesses. In this case, the choice of corporate location, accounting procedures, and the attempt to combine G & N with Goldsmith's other businesses were all decisions made by a president and are ultimately the responsibility of the board of directors. Although all involve potential conflicts, none was concealed from the board or the shareholders. The location of G & N's operations was never questioned by anyone other than Goldsmith himself and appears to have been ratified by the shareholders until the spring of 1995 when the parties began open warfare. The tax and accounting policies all apparently relate to the failed effort to achieve ownership sufficient to consolidate G & N with Goldsmith's other operations. First, no damages flowed from these aborted efforts. Second, in and of itself, attempting to consolidate with a corporation that can provide tax advantages is not improper if it does not otherwise operate to the corporation's disadvantage.

a conflict of interest if any one of three circumstances is found. They are (1) approval by disinterested directors, which is inapplica-

ble here, (2) "ratification" by the shareholders even if they are interested, and (3) that the transaction is "fair to the corporation."

It has been suggested that the director's judgment should be given the widest leeway when the subject matter is the operation of the business or the approval of transactions that affect the ownership or structure of the business. Bayless Manning, *Reflections and Practical Tips on Life in the Boardroom After Van Gorkom,* 41 Bus. Law. 1, 5 (1985). Location of the facilities, salaries of employees, and chain of suppliers all fall in the former, sometimes denominated "enterprise" issues. The latter, "ownership-claim" issues, include mergers, sale of assets, and acquisition of control. Indiana's Business Corporation Law imposes the same standard of liability—recklessness or intentional misconduct-on both. Nevertheless, we think the judicially—crafted "business judgment rule" operates to give broadest leeway to judgments that raise enterprise issues, if for no other reason than the self-interest of the directors/controlling shareholders is less directly involved. In and of themselves, these issues present no basis for challenging the judgment of Goldsmith as reckless or intentional wrongdoing because we have no clear evidence that the decisions were not judged to be in the best interest of G & N. The trial court found they were motivated by Goldsmith's objective to reduce his personal exposure on the debt of his other corporations. But this motivation does not necessarily imply that G & N would not also be benefited by increased cash flow from tax-sheltered money and we have no findings on the operational advantages or disadvantages the proposed mergers would entail.

## C. *Fiduciary Duty to Boehm*

Boehm also alleges that Goldsmith violated his fiduciary duties to Boehm as a shareholder. Goldsmith claims that the trial court erred by allowing Boehm to pursue these claims in a direct action because Boehm's sole harm was a decrease in stock value that resulted from losses at the corporate level. Insofar as Boehm relies on claims that Goldsmith violated his fiduciary duties to Boehm as a shareholder in a closely held corporation, these are properly asserted in a direct action because they are based upon rights and duties owed to Boehm, not the corporation. *See Barth,* 659 N.E.2d at 560–61 & n. 4.

The standard imposed by a fiduciary duty is the same whether it arises from the capacity of a director, officer, or shareholder in a close corporation. *Hartung v. Architects Hartung/Odle/Burke, Inc.,* 157 Ind.App. 546, 552, 301 N.E.2d 240, 243 (1973). "The fiduciary must deal fairly, honestly, and openly with his corporation and fellow stockholders. He must not be distracted from the performance of his official duties by personal interests." *Id.,* 301 N.E.2d at 243; *accord W & W Equip. Co. v. Mink,* 568 N.E.2d 564, 571 (Ind.Ct.App.1991), *trans. denied.* Other states have stated it slightly differently: controlling shareholders must "observe accepted standards of business ethics in transactions affecting rights of minority shareholders," and apply a "strict good faith standard." *Burt v. Burt Boiler Works, Inc.,* 360 So.2d 327, 332 (Ala.1978); *Estate of Schroer v. Stamco Supply, Inc.,* 19 Ohio App.3d 34, 482 N.E.2d 975, 980 (1984) (quoting 2 F. Hodge O'Neal, *O'Neal's Close Corporations* § 8.07, at 45 (2d ed.1971)). These states have allowed recovery for excluding the minority shareholder from meaningful participation in the company, *Orchard v. Covelli,* 590 F.Supp. 1548, 1558 (W.D.Pa.1984), and for "effectively frustrat[ing] the minority stockholder's purposes in entering the corporate venture and also deny[ing] him an equal return on his investment," *Wilkes v. Springside Nursing Home, Inc.,* 370 Mass. 842, 353 N.E.2d 657, 663 (1976). However, as one court cautioned, there must be a balance struck between the majority's fiduciary obligations and its rights. *Wilkes,* 353 N.E.2d at 663. It is also the policy of the law to leave corporate affairs to the control of corporate agencies "except in a plain case of fraud, breach of trust, or such maladministration as works a manifest

wrong to [the shareholders]." *Mink*, 568 N.E.2d at 575 (citations omitted).

In this case, Boehm contends that Goldsmith violated his fiduciary duty to Boehm as a fellow shareholder by (1) sending the eviction notice, (2) threatening the viability of the corporation to force other shareholders to sell, (3) reducing Boehm from a plurality shareholder to a minority by wrongly terminating cash distributions, and (4) attempting to buy Boehm's shares at an inadequate price. The trial court concluded, correctly, that shareholders in a close corporation owe each other duties analogous to partners in a partnership. *Barth*, 659 N.E.2d at 561 & n. 6.

At first blush, one issue here is whether the fiduciary duty as a majority shareholder extended to use of relationships outside the corporation. Goldsmith had multiple relationships to G & N. He was its officer, director, and landlord. He was also a major shareholder of a critical supplier. He acted in all of those capacities before he became the majority shareholder. After acquiring Gilliland's and McCoy's shares, he also became the controlling shareholder. Some of Goldsmith's actions that were found wrongful were taken in a capacity other than officer, director, or shareholder of G & N. Specifically, his threat to evict G & N was made in his capacity as an individual landlord. Presumably, if he held no position in G & N this would have been a lawful act on his part. Boehm has not alleged that Goldsmith, as president of G & N, wrongfully exposed G & N to a lease that permitted its eviction, so the only action complained of in this issue is the eviction notice itself, which is an act of the landlord. The obligations of a majority shareholder are sometimes phrased in terms of then Judge Cardozo's famous description of the obligation of partners to act with "[n]ot honesty alone, but the punctilio of an honor of the most sensitive." *Meinhard v. Salmon*, 249 N.Y. 458, 164 N.E. 545, 546 (1928). Whether this standard imposes duties on majority shareholders in other capacities is

an interesting question. However, for the reasons explained below, the relief ordered by the trial court was justified by actions taken as a shareholder, officer, and director, and we need not resolve this issue.

1. *Actions Before Goldsmith Acquired Majority Control of G & N*

Goldsmith attempted to purchase Boehm's shares of G & N for more than $100,000 less than he had previously had the shares appraised for and $50,000 less than his original purchase price. In and of itself, this is not a breach of duty. Absent nondisclosure, fraud, or oppression, a majority shareholder has no duty to pay a "fair" price for shares. *Cf. Joseph v. Shell Oil Co.*, 482 A.2d 335, 341 (Del.Ch. 1984). However, when Boehm refused his offer, Goldsmith attempted to force Boehm to sell his shares by limiting Boehm's role in the management of G & N and cutting off cash distributions from the company. The trial court concluded:

> Paul Goldsmith breached his fiduciary duty to the corporation and his fellow shareholders by pursuing his own personal interests at the expense of G & N when he plotted to merge his other corporations with G & N and use G & N's cash flow to pay off debts of his other businesses and himself.

> Paul Goldsmith breached his fiduciary duty to G & N and his fellow shareholders when he communicated his intention to terminate the lease between himself and G & N in order to force other shareholders to sell their stock in G & N to him.

> . . . .

> Defendant, Paul Goldsmith has, by operating in a manner unfair to other shareholders, being dishonest with other shareholders and through secretly plotting a takeover of G & N and a freeze out of other shareholders, placed himself in a position to continue to violate his fiduciary duty to the shareholders and the corporation. . . .

Goldsmith claims that there can be no breach of a fiduciary duty, or at least no damages, because he never purchased Boehm's shares and therefore Boehm was not harmed. Although Goldsmith's plan to force Boehm out of the corporation was not completed, Goldsmith consummated several steps in his effort to acquire Boehm's shares. Notably, he acquired the G & N shares held by Gilliland and McCoy, which gave him majority control of the corporation. If he accomplished this by wrongful use of his corporate office, this would plainly create a cause of action in favor of the selling shareholders.

The first question becomes whether the leverage used to cause the sale was improper use of a position with G & N, or was simply a hardball, but lawful, use of economic power derived from a source other than an office or directorship with G & N. As landlord, Goldsmith was free to charge the rent he wished. As owner of Edgecumbe, he was free to charge whatever price he wanted for its parts. But as director and majority shareholder, he was not free to disregard the interests of G & N. The trial court found, in effect, that the eviction was a sham and Goldsmith knew it. In resigning and reassuming the presidency to lend credence to the threat, Goldsmith abused his office. As events unfolded, the lease eviction was sufficient to coerce Gilliland and McCoy into what the trial court found to be "far from ... an arm's length transaction." Moreover, the trial court noted that "Paul Goldsmith's plan if neither of the buy out plans were successful [was] to stop purchasing Edgecumbe parts in order to force Gilliland and McCoy to sell their shares of G & N to Paul Goldsmith." This is a finding that Goldsmith planned to facilitate a scheme to threaten economic harm to both G & N and Edgecumbe and thereby coerce a sale of G & N shares owned by minority shareholders of Edgecumbe. The acquisition of majority control was accomplished by a plan that included an intentional misuse of corporate office for personal gain.

To the extent Goldsmith coerced a sale at less than fair value, or, if Edgecumbe had been cut off, to the extent Edgecumbe was damaged, Gilliland and McCoy would have a direct claim (as shareholders of G & N) or a derivative claim (as shareholders of Edgecumbe). Neither has been asserted. Instead, Boehm has sued, claiming that the net result of the Goldsmith/Gilliland/McCoy transactions was to reduce his 34% holding from a plurality to a minority. The trial court correctly concluded that this set of circumstances also provides the basis for a claim by Boehm. These steps alone would not have achieved Goldsmith's stated goal of 100% ownership (or even the 80% we assume he may have coveted). Nevertheless, the acquisitions leading to majority shareholder status were wrongs to Boehm because they were steps in a plan ultimately designed to use Goldsmith's position with G & N not for any proper business purpose of G & N, but rather to squeeze Boehm out. The trial court found his damages to be the reduction in value of Boehm's shares due to their status as minority subject to a dominant majority. Because of our resolution of the remedy issue in Part II.C.3, we do not attempt to quantify these damages

### 2. Actions as Majority Shareholder

After acquiring control of G & N, Goldsmith terminated Boehm and shut off cash distributions, leaving Boehm a shareholder in a Subchapter S corporation receiving taxable income, but no cash to pay the taxes. If this was done for legitimate business reasons, it is protected by the business judgment rule. The trial court found, however, that the motive was to eliminate Boehm as a shareholder to permit Goldsmith to file consolidated tax returns and bail out his other businesses. Specifically, the trial court found that, "Paul Goldsmith breached his fiduciary duty to the corporation and his fellow shareholders by pursuing his own personal interests at the expense of G & N when he plotted to merge his corporations with G & N and use G & N's cash flow to pay off

debts of his other businesses and himself." That finding is not clearly erroneous and supports a claim by Boehm against Goldsmith under the *Barth* doctrine.

### 3. *Remedies Against Goldsmith*

#### a. *Judicially Ordered Sale*

 The trial court concluded that no remedy short of a forced sale was appropriate. We agree. This corporate marriage cried out for dissolution by the time it reached the courts. There was no deadlock that would trigger the receivership provisions of Indiana Code section 23–1–47–1. Damages are ordinarily the proper remedy for a shareholder aggrieved by breach of director duty. However, we think the remedy ordered by the trial court is appropriate here.

 The trial court awarded Boehm the buy-out of his stock for $521,319, damages of $173,939 for the amount of undistributed profits for the period of Goldsmith's domination, $175,000 in punitive damages, and attorney's fees. Goldsmith contests all of these awards. First, Goldsmith claims that the judicially ordered sale is improper because the legislature provided dissenters' appraisal rights only in the case of a specified corporate action (merger, etc.), none of which are present here. As a preliminary matter, we agree with the trial court that *Fleming v. International Pizza Supply Corp.*, 676 N.E.2d 1051 (Ind.1997), is not applicable here because there has been no corporate action that gives rise to dissenters' rights. *See* Ind.Code § 23–1–44–8 (1998). Although dissenters' rights are the exclusive remedy in cases of merger, sale of substantially all of a corporation's assets, and the other listed transactions, the Code does not preclude a court from fashioning appropriate remedies in other situations. As a general proposition, a trial court "has full discretion to fashion equitable remedies that are complete and fair to all parties involved." *Hammes v. Frank*, 579 N.E.2d 1348, 1355 (Ind.Ct.App.1991). In this case, the trial court ordered Goldsmith to purchase Boehm's shares as a remedy for his actions in violation of his fiduciary duties to Boehm in the course of a plan attempting to coerce Boehm into selling his shares. By forcing the other shareholders to sell their shares and limiting Boehm's role in the corporation, Goldsmith essentially rendered Boehm's shares valueless. It is difficult to imagine who would buy them and Boehm, himself, can receive no benefit from them. The trial court's order for Goldsmith to pay Boehm the fair market value in exchange for his shares is affirmed.

In a number of states, "oppressive conduct" by the directors or a majority shareholder is a statutory ground for dissolution of the corporation. *See generally* Robert B. Thompson, *The Shareholder's Cause of Action for Oppression*, 48 Bus. Law. 699, 708–10 (1993). The Indiana Business Corporation Law was enacted at the highwater of concern for excessive ease of takeover of publicly traded companies. A number of its provisions are aimed directly at curbing perceived abuses and the commentary to the BCL includes a number of comments explicitly and implicitly seeking to further that goal. Judicial dissolution for oppressive conduct was intentionally deleted from the remedies available under the Revised Model Act 14.30(2)(ii) because of a concern that it might be abused in a hostile takeover. Ind.Code Ann. § 23–1–47–1 cmt. (West 1998). Accordingly, if G & N were a publicly traded corporation, this remedy would not be available under Indiana law. However, the reasons for omitting an express remedy of judicial dissolution for oppressive conduct are not relevant in the context of a close corporation. The commentary thus leaves us with the unadorned language of the statute as to the availability of that remedy in a close corporation.

 Unlike a number of states, Indiana has no corporate law specifically applicable to close corporations. The shareholder derivative action is a creature

of equity. *Griffin v. Carmel Bank & Trust Co.*, 510 N.E.2d 178, 183 (Ind.Ct. App.1987) ("A derivative action is always in equity even though the only relief available is damages and the corporation could have maintained an action at law."), *trans. denied.* Similarly, a *Barth* direct action is for breach of a fiduciary duty, which is also a claim in equity. *Cf. Ross v. Tavel*, 418 N.E.2d 297, 304 (Ind.Ct.App.1981). In either case, we agree with the trial court that traditional powers of equity courts are available to fashion a remedy for breach of a fiduciary duty in a close corporation. We also agree with the courts that have recognized the need for more flexible remedies in the case of close corporations. Unlike shareholders in a publicly traded corporation, the oppressed minority in a close corporation does not have the option of voting with its feet by selling its shares in a public market for a presumptively fair price.

■ For essentially the same reasons we recognized the availability of a direct action by a minority shareholder in a close corporation in *Barth,* we conclude it is appropriate in this context to fashion a remedy that may amount to a forced dissolution or sale of shares. This remedy should be exercised only after careful thought. It amounts to a forced withdrawal of capital from the enterprise if the enterprise itself is the only realistic source of funding the buyout. This can be true if the corporation is the buyer or the funding source for the buying shareholder. If the purchase price is greater than a damage award, the effect may be to force a withdrawal of capital beyond the level of damages owed. Particularly if the business is in a startup mode, a forced liquidation of assets may severely impact it. *See generally* Edward B. Rock & Michael L. Wachter, *Waiting for the Omelet to Set: Match Specific Assets and Minority Oppression in Close Corporations*, 24 J. Corp. L. 913 (1999). Nevertheless, we agree with the Court of Appeals that the remedy fashioned by the trial court in this case was

within its discretion. If Boehm had acceded to Goldsmith's tactics and sold for $250,000, he would still have his claim for damages in the amount of the difference between the fair value of his shares and the price they brought in an extorted sale. The remedy here produces essentially the same result. Moreover, the trial court found that G & N's worth was substantially more than its bank debt and that G & N was profitable. On those findings, the remedy is appropriate.

■ Goldsmith argues that Boehm's shares should be valued at a discount because of their minority status. Typically, minority shares in a two-shareholder corporation will be valued at less than their proportionate ownership. However, the value of the entire corporation is whatever it is. If there is a minority discount, there is also a majority premium. In this case, the majority premium is the result of the extorted acquisition by Goldsmith of the shares owned by Gilliland and McCoy. This again raises the issue of whether those transactions were the result of a misuse of Goldsmith's role as an officer or director of G & N. Because we affirm the trial court's finding that they were the product of wrongful action by Goldsmith as officer and director of G & N, that majority premium should be viewed as a corporate asset. It is inappropriate to give Goldsmith the benefit of a minority discount that was the product of his wrongful acts. The trial court listened to experts from both sides and pointed out problems with each before arriving at $521,319 as the value for Boehm's shares. Because that amount is supported by the evidence, we cannot conclude that the trial court erred in its determination.

b. *Reimbursement for Omitted Dividends*

■ The trial court further ordered Goldsmith and G & N to pay Boehm the amount he lost in income from 1994 to 1996 as a result of cessation of G & N's distributions to shareholders. That

$173,939 remained in the company instead of being distributed to the shareholders. As such, it increased the value of the shares and was included in the valuation of the shares as of 1996. Payment of both the full value of the shares as of 1996 and also the back dividends produces a double recovery for Boehm. The trial court's judgment awarding $173,939 in back dividends is reversed. As of the date of valuation of the sale ordered by the Court, Boehm should no longer be viewed as an equity participant in G & N and is not entitled to further dividends. The trial court also awarded dividends until the fair value of Boehm's shares is paid. As of the date of judgment Boehm is properly viewed as a creditor of Goldsmith entitled to postjudgment interest, but no longer sharing either the upside or downside of G & N's profitability. This award is also reversed.

### c. *Punitive Damages*

■ Next, Goldsmith contends that punitive damages are inappropriate. He claims that because there is no basis for compensatory damages, punitive damages may not be awarded. However, as discussed above, Boehm suffered harm from Goldsmith's breaches of his fiduciary duties to Boehm and may be awarded compensatory damages. We agree with the Court of Appeals that punitive damages are also appropriate. As the Court of Appeals put it:

> Goldsmith deliberately acted, over a period of time, to relegate Boehm to a minority position and effectively "freeze" Boehm out through a denial of dividends.... In light of this evidence, we cannot say that the trial court erred in concluding that Goldsmith's conduct was oppressive and malicious.... Thus, the award of punitive damages in Boehm's favor was proper.

*G & N Aircraft,* 703 N.E.2d at 680.

### d. *Attorney's Fees*

■ Goldsmith argues that the award of attorney's fees is contrary to law. The trial court awarded Boehm "attorney's fees in this action," but did not specify for what or from whom. The Court of Appeals modified this award to allow for attorney's fees against G & N for the derivative action, but no fees against Goldsmith in the direct action. We agree with the Court of Appeals that Boehm is not entitled to attorney's fees from Goldsmith in his direct action. The "United States Rule" is that parties bear their own fees in the absence of a statute or a basis in quantum meruit for reimbursing a party who has benefited others. The direct action by Boehm fits neither category.

■ We also conclude that he is not entitled to attorney's fees for any derivative claims. First, as has been seen from the foregoing, we found the direct claims to be the basis of recovery. A shareholder bringing a successful derivative action can recover attorney's fees from the corporation, but in the absence of a fee shifting statute such as the one we find in the antitrust laws, there is no basis for recovery from the defendant. The theory underlying an award of fees in a derivative suit is that the recovery goes to the corporation as a whole, not the individual shareholder. The shareholder who has performed a service for the corporation by bringing the derivative action is entitled to be paid his fees and expenses incurred in conferring that benefit. But recovery in this case by Boehm conferred no benefit on the corporation as a whole. As *Barth* noted, one effect of allowing direct actions in closely held corporations is that "the plaintiff, even if successful, cannot ordinarily look to the corporation for attorney's fees." 659 N.E.2d at 563. We affirm the trial court's judgment that G & N is liable for Boehm's attorney's fees and expenses connected with its frivolous counterclaim. The remaining award of attorney's fees was in error and is reversed.

### III. Claims against G & N

Boehm's complaint and the trial court and Court of Appeals' rulings against G &

N appear to be based on the same allegations as the complaint against Goldsmith. G & N claims that it owes no fiduciary duty to its shareholders and cannot be held liable for any breaches of fiduciary duty by Goldsmith. Therefore, it argues that it is not liable to Boehm for the buyout of his shares or any other damages.

### A. *Claims for Breach of Fiduciary Duty*

■ The trial court and Court of Appeals granted relief against G & N because there is "vicarious liability a corporation has for actions taken at its president's direction." *G & N Aircraft,* 703 N.E.2d at 676. Although a corporation may be held liable for acts committed by the president within the scope of his employment, that is not the basis of the relief awarded here.

To the extent Goldsmith as an officer and director breached fiduciary duties to the corporation, Boehm as a shareholder could pursue a derivative action in the name of the corporation. If the corporation were itself liable on such a claim, the recovery becomes circular. The corporation is the real party in interest as a plaintiff in a derivative suit, and therefore is the party who receives the recovery, not the party who pays for the harm. On the other hand, the theory of a *Barth* recovery is that the minority is compensated only for damages inflicted on the minority shareholders of the corporation, not for injury to the corporation as a whole. If the corporation were liable for that amount, it would essentially require the continuing shareholders, including the minority shareholder/plaintiff, to pay for a portion of the damages awarded to them that were caused by the offending officer/director/shareholder. Once again a part of the recovery would be circular. Here, because Boehm is being bought out, that point is irrelevant. But his claim under *Barth* remains a claim against Goldsmith, not G & N.

In sum, G & N is not liable for the damages awarded due to Goldsmith's breach of his fiduciary duty. Of course, the minority shareholder may seek to satisfy the judgment by execution on the majority's share holdings in the corporation. But awarding a judgment against the majority shareholder and requiring this route to the corporate pocketbook minimizes the risk of preferring the shareholders over creditors if the corporate pot is insufficient to pay the judgment.

### B. *Claims to Compel Dividends and for Access to Records*

■ Boehm's claims to direct the distribution of dividends and to compel access to records are correctly brought as direct actions against G & N. However, they are moot as a result of our affirmance of the purchase remedy.

■ Indiana Code section 23–1–52–2 provides shareholders with the right to inspect corporate records. If Boehm were prohibited from exercising his rights, the remedy would be an action to compel the corporation to allow Boehm access to the records as described in Indiana Code section 23–1–52–2(a). However, because we have affirmed the judgment directing Goldsmith to buy Boehm's shares for fair value, Boehm is no longer a shareholder. Nonetheless, until the transaction is closed, he should have the same right. Thus, the trial court's order to allow Boehm access to the required records until such time as the stock purchase is consummated is affirmed.

### Conclusions

The judgment of the trial court is affirmed in part and reversed in part and this case is remanded with instructions to enter judgment for Boehm (1) requiring Goldsmith to purchase Boehm's G & N shares for $521,319, (2) awarding Boehm postjudgment interest on the purchase price, (3) awarding punitive damages of $175,000 against Goldsmith, and (4) award-

ing Boehm attorney's fees from G & N for the defense of the frivolous counterclaim.

SHEPARD, C.J., and DICKSON, SULLIVAN, and RUCKER, JJ., concur.