**LEES INNS OF AMERICA, INC.,**
**Appellant–Plaintiff,**

v.

**WILLIAM R. LEE IRREVOCABLE TRUST, and Donald Eugene Lee and Robert Earl Lee, as Co–Trustees of the William R. Lee Irrevocable Trust, Appellees–Defendants.**

No. 40A01–0901–CV–47.

Court of Appeals of Indiana.

March 15, 2010.

Jon Laramore, Trina K. Taylor, Baker & Daniels, Indianapolis, IN, Attorneys for Appellant.

David E. Wright, William Bock, III, Kroger, Gardis & Regas, LLP, Indianapolis, IN, Attorneys for Appellees.

## Opinion

BAKER, Chief Judge.

This eight-year-long litigation involving an Indiana-based hotel chain that was commenced under the Dissenter's Rights Statute[1] has resulted in a judgment in excess of $7.5 million in favor of the minority shareholders in the corporation. Appellant-plaintiff Lees Inns of America, Inc. (Lees Inns), appeals the trial court's judgment in favor of appellees-defendants William R. Lee Irrevocable Trust, Donald Lee, and Robert Lee as co-trustees (collectively, the Trust), in this action that Lees Inns initiated. Specifically, Lees Inns argues that the trial court erred in refusing to appoint a master or expert appraiser to assist in calculating the value of Lees Inns' business. Lees Inns also claims that the trial court erroneously adopted a valuation of the business that was based, among other things, on speculative future transactions and that the evidence did not support a finding of a breach of fiduciary duty by the majority shareholder. The Trust

---

1. Ind.Code § 23–1–44–1 et seq. In general, this statute provides a procedure for minority shareholders to disengage from a corporation if they dissent from certain corporate actions, including mergers. I.C. § 23–1–44–8(A)(1). When a minority shareholder has dissented, the shareholder may "obtain payment of the fair value of the shareholder's shares" by following the procedures set forth in the statute. *Id.*

cross-appeals, claiming that the trial court abused its discretion in awarding it prejudgment interest for only one-half of the relevant period because the Dissenters' Rights Statute expressly provides otherwise.

We conclude that the trial court properly exercised its discretion in denying Lees Inns' motion for a master or expert appraiser to assist it in calculating the value of the business. We also find that the trial court properly valued the business based on the evidence presented and that it correctly determined that the majority shareholder was in breach of his fiduciary duties that he owed to fellow directors and shareholders. Moreover, we conclude that the trial court properly disregarded a number of real estate options that were granted to the majority shareholder in determining the damages that resulted to the Trust as a consequence of the breaches of fiduciary duty. Finally, we conclude that the trial court properly reduced the amount of prejudgment interest that the Trust requested in light of the delays that resulted in bringing this matter to trial. Thus, we affirm the trial court's judgment in all respects.

## FACTS [2]

Lees Inns was created in 1974 as a public company to build and operate hotels. During the mid to late '70s, Lees Inns raised $5 million in a public stock offering and opened several hotels in different states, including Indiana. Lester and William Lee, who were brothers, each owned 25% of the company in the initial, public phase. At the time, the company had more than 1000 shareholders. Most of the hotels were owned by limited partnerships, with Lees Inns as the general partner in each partnership.

Lees Inns also had subsidiary companies including a construction company (Prime Construction Management, Inc.), a mortgage company (State Mortgage Corp.), a design company (Hospitality Designers & Consultants, Inc.), and a management company (Lees Inns Management Co.), which all provided various services to Lees Inns.

Despite a promising start, Lees Inns was reduced to $300,000 in cash and one hotel in 1984. At this point, William's sons—Robert and Donald Lee—joined the Lees Inns business. Robert oversaw the construction of nineteen hotels from 1985–1997. During this time frame, Lees Inns' annual revenue grew to $20 million.

While Robert and Donald focused on construction and operations, Lester was responsible for Lees Inns' finances. In 1994, Lees Inns "went private," and "bought out" the public shareholders. Tr. p. 51. After this transaction, only Lester and William had ownership interests in the surviving entity. Lester owned 516 shares and William owned 484 shares of the corporation.

Lester's contributions to Lees Inns in 1994 and 1995 were limited because he was forming Maxim, a new ready-mix truck business. During this time, Lester discussed a plan for transfer of the ownership of Lees Inns stock to the Trust, of which Donald and Robert were trustees. Donald, Robert, and William made no investments in Lees Inns. The Trust's stock was a gift from Lester (originally to William, who later placed it in the Trust). While Lester was not substantially involved with Lees Inns in 1996 because of health issues

---

2. We held oral argument in Indianapolis on February 17, 2010. We commend counsel for their able presentations.

and his preoccupation with Maxim, he eventually left that company to devote more time to Lees Inns.

At a shareholders meeting in 1997, Lester's family members approved a new compensation package for Lester, which included a $200,000 bonus, rent increases and leasehold improvements to his property in the amount of $130,000. When the Trust questioned Lester's compensation, the response was that "salary and rental increases … are an attempt to bring the Company's costs into line with the market and provide a fair return to Lester for his contributions to the Company." Appellant's App. p. 653. The Board also ratified an agreement by Park Inn International LLC (Park Inn), to purchase seventeen hotels from Lees Inn for $65 million. However, the deal was not consummated because Park Inn was acquired by another company.

Thereafter, Lester began borrowing funds from Lees Inns to support the financial condition of the other companies that he owned. At a shareholders meeting on May 13, 1998, the Trust was denied shareholder status. Donald and Robert were removed from the Board that year and were replaced by other family members, including Lester's children. Lester adopted the position that William Lee—and not the William Lee Trust—owned the shares of Lees Inns stock.

At or following the May 1998 shareholders meeting, Lester told Donald and Robert, the co-trustees of the Trust, that: "I will screw you at every opportunity—I will do everything I can to make sure you never receive one dime from this company. I plan to issue options to myself for additional company shares." Tr. p. 479, 1041–42.

On November 29, 1999, the Board adopted an Incentive Compensation Agreement (Compensation Agreement) for Lester. In particular, the Compensation Agreement devalued Lees Inns' interest in its assets by $11.6 million pursuant to Lees Inns' valuation expert. Lester was also compensated for providing personal guarantees up to $15 million on Lees Inns' debts and the Compensation Agreement provided Lester with options to acquire the properties on which he had loan guarantees.

By December 31, 1999, Lester was indebted to Lees Inns for over $1 million. General and administrative expenses increased to over $1 million from 1996 to 2000. Although Lees Inns operated nineteen hotels in four states, Lees Inns was not profitable and its expansion attempts were frustrated by a lack of available capital. Prior expansion had been financed by debt, some of which Lester had been required to personally guarantee. Lees Inns' management believed in 2000 that the only future sources of available capital for expansion "are the investment of additional equity in the Company by its existing shareholders, or its ability to incur additional debt." Appellant's App. p. 743.

Although Lees Inns made efforts to market several of its properties for sale, Lees Inns had been able to sell only three hotels and one vacant parcel by 2000. The properties were listed at $3,614,015.00, but sold for only $2,002,725.30. Also that year, Lester decided that Lees Inns should engage in a merger transaction to change its ownership structure. However, William and representatives of the Trust rejected a request to merge Maxim with Lees Inns. To attain a structure in which Lester would be the sole owner of Lees Inns' stock, Lees Inns would merge with LLL Acquisition Corporation in a transaction in which the Trust—the sole minority owner—was bought out. Lester voted in favor of the merger and William (by Donald and Robert, his sons and trustees) voted

against it. William was paid a value for his shares that was determined by a valuation performed by Goelzer Investment Banking (Goelzer), which a majority of the Board accepted. In particular, Goelzer valued each share at $1,945 (for a payment to the minority of $941,380).

The Trust dissented to the merger, asserted its rights, and demanded payment. The Indiana Secretary of State approved the Articles of Merger on June 26, 2000, and on July 21, 2000, the Trust notified Lees Inns that its estimate of the fair value of its shares was $15 million. As a result, it demanded payment of an additional $14,058,620. Thereafter, Lees Inns filed a petition for a "determination of fair value." *Id.* at 51. Approximately one year later, the Trust counterclaimed for breach of fiduciary duty and fraud. In particular, the Trust alleged that Lester's conduct lowered the value of Lees Inns' stock on the date of valuation.

On December 11, 2006, Lees Inns requested that the case be referred to a Special Master or appraiser with valuation expertise because "it is unlikely that anyone without a background and advanced education in finance and business valuation will be able to sort out the numerous disputes and variations in methodology" presented by the parties' experts. *Id.* at 106.

A bench trial was held on September 17–27 and October 20–23, 2008. On the first day of trial, Lees Inns sought to "renew the Motion for Appointment of Either a Special Master or Expert under the [Dissenters'] Rights Statute to assist the Court in making a decision in this case." T. App. p. 1. In response, the trial court determined that the motion had been made some time ago, that it had not been discussed for some time, the "issue was kind of dropped," and that it was "too late to do so now." *Id.* Thus, Lees Inns' request was denied.

At trial, the parties offered three valuations for the trial court's consideration:

## A. The Goelzer Opinion

This opinion, which was used to value the payment to the Trust at the time of the merger, was based on financial information from Lees Inns as well as general market data, industry information, and other relevant information. Appellant's App. p. 197–98. In particular, the report stated that there was a "pessimistic" view of the short-term outlook in the lodging industry. *Id.* at 205. It was indicated that there was an oversupply of rooms—particularly in the limited services sector—where Lees Inns is classified. The report also noted that the Central Region, where Lees Inns' properties are located, was more "oversupplied" with rooms than other regions. *Id.* at 206–07.

Goelzer's analysis of Lees Inns' financial information showed no revenue growth in the three years before the merger and concluded that the business operated at a loss in 1998 and 1999. *Id.* at 207–08. The report described Lees Inns as "highly leveraged" with declining revenues and declining profitability that "generates concern over the future earnings capacity of the Company and its ability to weather an economic downturn." *Id.* at 209. It stated that Lees Inns' business plan included downsizing management and upgrading properties through "[r]efurbishing, construction, and renovation to begin in 1999 and be completed by the end of 2000." *Id.* at 204.

In short, the report described Lees Inns as "a company with a great deal of risk." *Id.* at 210. Moreover, it was expected that no positive cash flow would result in the years 2000 to 2005. Goelzer's calculation of equity value based on a discounted cash flow approach amounted to $1,945,000. Goelzer also calculated an orderly liqui-

dation value for the business, totaling $1,911,000. *Id.* at 219. Lees Inns used Goelzer's $1,945,000 going-concern valuation to compensate the minority shareholders, who received 48.4%, or $941,380.

## B. The Deloitte Valuation

The Deloitte valuation, which was obtained by the Trust, began with a real estate appraisal through Arthur Andersen LLP (Andersen). Andersen appraised each property separately and reached a total valuation of $62,448,000. These were fair market value appraisals that targeted the sale price of each property in a stable market. The appraisals assumed that each property would be on the market for 6–9 months.

Andersen's report echoed Goelzer's pessimistic market information. Deloitte used the Andersen appraisal and other information to create a fair market value. Deloitte noted that in accordance with its 1999 annual report, the Company was in the midst of a six-phase business plan, which consisted of the following objectives:

• Downsizing corporate management;

• Selecting certain properties to be upgrades to Lees Inns & Suites;

• Refinancing and renovating;

• Preparation of cost estimates, drawings, and exterior/interior design;

• Redesigning existing interior rooms for refurbishing; and

• Refurbishing of existing rooms, construction, renovation, and financing to be completed by December 2000.

*Id.* at 564.

Like the other valuations, Deloitte noted that growth was flat in 1998 and 1999. Deloitte pegged this "decline in profitability" to the market for hotel rooms generally as well as to Lees Inns' increased spending to accomplish its business plan. *Id.* However, Deloitte accepted Andersen's assumption that Lees Inns' income would increase in the future.

Deloitte also noted that the "hotel industry appeared to be experiencing the impact of a cyclical downturn" because of the increased number of rooms and that pressure on profitability would grow in the midscale portion of the market, which included Lees Inns. *Id.* at 569. The report indicated that Lees Inns had "strong prospects for improved future profitability" because of its refurbishment program, cost cutting, and expanded marketing. *Id.*

Deloitte's "Valuation Considerations" included several reasons why Lees Inns would be an acquisition target, including that it was a profitable going concern with brand identity, that it was adaptable to a national chain, and that its business strategies were compatible with acquisition. *Id.* at 573. These matters were considered "key considerations with respect to the valuation of [Lees Inns]." *Id.*

Deloitte presented two scenarios for its discounted cash flow approach. In the first, Lees Inns remained an independent company and acquired or constructed three additional hotels in the next five years. *Id.* at 576. In the other, Lees Inns would be acquired by a hotel chain, resulting "in efficiencies and therefore, lower fixed and other corporate overhead costs." *Id.* at 577. Under this scenario, Deloitte reduced Lees Inns' operating costs by more than 25%. Tr. 1009–10, 1051.

Deloitte's original valuations under this approach were $14,000,000 for Lees Inns as an independent entity with three additional hotels and $15,500,000 if Lees Inns was acquired. Appellant's App. p. 583. However, Deloitte revised its valuations in 2007 and decreased projected cash flow by adjusting depreciation and amortization "due to the aging of [Lees Inns'] existing property base." *Id.* at 637. Deloitte's final valuations based on this approach were

$12,100,000 under the scenario in which Lees Inns remained independent and added three hotels, and $13,800,000 for the acquisition scenario. *Id.*

Deloitte also used a "market" approach to valuation, which considered "guideline transactions," comparing Lees Inns to "similar businesses acquired by public companies." *Id.* at 579. Deloitte initially valued Lees Inns at $14,300,000 under this approach in 2003, but after changing certain assumptions and methods, it revised this figure to $11,400,000 in 2007. *Id.* at 640. In determining a final valuation, Deloitte placed a value of $12.2 million for the enterprise, with a 48.4% minority share value of $5.9 million.

### C. The Empire Valuation

In 2008, Lees Inns obtained a valuation from Empire Valuation Consultants (Empire), which reached a value similar to Goelzer's. Empire's report described Lees Inns and its affiliate and subsidiary companies and repeated the information about Lees Inns' business plan that was in Goelzer's report. Empire also reviewed Lees Inns' performance in the context of information about the hospitality sector, concluding that "growing industry supply and competition and [Lees Inns'] lack of maintenance investment in its properties was credited to have caused [Lees Inns] to significantly underperform relative to its industry." Appellant's App. p. 293. Although Lees Inns planned refurbishment to reverse this trend, "[a]s of the Valuation Date, the Company's efforts had not yet shown positive results." *Id.* The Empire evaluator concluded that Lees Inns was behind its national competitors and below the national average in occupancy. Tr. p. 397–99.

The Empire valuation also noted that both Goelzer and Deloitte projected 2000 earnings for Lees Inns that were higher than the earnings that actually occurred.

Appellant's App. p. 297. Empire opined that Goelzer overstated hospitality revenues by 13.8% and Deloitte overstated them by 10.5%. Deloitte projected 2000 profits of $3.7 million despite knowing that the actual profits for the first half of the year were just $104,000. Lees Inns' actual profits for the year were $596,000, about one-sixth of Deloitte's projection.

Empire used a different valuation approach than the others by using historical results to determine the value of a company's owners' capital. *Id.* at 299. Empire checked its valuation using the "guideline company" method. *Id.* at 297–302. It compared "[p]rice-to-earnings ratios, or other similar ratios" of comparable public companies, usually with some adjustments for the additional risk of a private company, and calculated total invested capital at $42,582,568 under this method. *Id.* at 307, 310. Empire also averaged two calculations of total invested capital, which amounted to $42,153,003. From this value, it subtracted Lees Inns' debt and added back the net market value of non-operating assets (excess land and receivables) to obtain a going-concern value of $1,768,785 for Lees Inns as of June 30, 2000.

At the close of trial, the Trust requested pre-judgment interest in accordance with Indiana Code section 23–1–44–19(e) of the Dissenter's Rights Statute. The trial court adopted the Deloitte appraisal for valuing Lees Inns and granted judgment to the Trust. The trial court entered ninety-four findings of fact and twelve conclusions of law and awarded $4,959,620 to the Trust, plus $1,673,160.09 in interest, expert fees, expenses of $275,692.67, and attorneys' fees in the amount of $614,405.97. However, rather than awarding the Trust the full amount of pre-judgment interest that was requested, the trial court reduced the total amount by one-half, stating that the case could have been resolved in less

time. As a result, the total judgment award amounted to $7,522,897.73.

In its findings, the trial court determined that Lester manipulated and controlled Lees Inns' assets and liabilities, which inured solely to him and to the detriment of the minority shareholders. The trial court did not determine an amount of damage prior to June 1999, and did not add any amount to the value for a breach of fiduciary duty for the period prior to June 1999.

However, the trial court found that Lester breached his fiduciary duties to the minority shareholders prior to 1999, in light of his self-motivated conduct. More specifically, the trial court found that there were "unusual and non-customary increases in salary, rent and economic benefits" that favored Lester. Appellant's App. p. 61. Although the trial court could not find that Lester's actions equated to a specific amount of damages, it determined that the related stock value would have been diminished.

The trial court disregarded Lester's real estate options for the purposes of determining fair value, but it determined that the benefits bestowed upon Lester in the Compensation Agreement were intended to devalue Lees Inns to the detriment of the Trust. The trial court also noted that Lester took personal and corporate actions relating to the Shelbyville real estate in 1999 and 2000, and ultimately reaped substantial economic personal benefits from that real estate. Moreover, it was determined that Lester took significant steps leading up to the Park Inn sale contract for $65 million for 17 hotels, including termination of Don Lee in November, 1997; receipt of the Park Inn offer in November, 1997; Lees Inns' adoption of a $200,000 bonus in 1997; and rent and compensation increases in 1997.

The trial court also pointed out that Lester testified at trial that he did not know whether the purpose of the 1999 Compensation Agreement was to lower the value of Lees Inns. The trial court determined that "yes" would have been an admission, and "no" would have been implausible. *Id.* at 63. As a result, the trial court drew the inference from the evidence that the purpose of the Compensation Agreement was to lower the company value.

The trial court determined that

93. By statute, Respondents are entitled to interest on a dissenter's rights judgment for the amount of the value in excess of the prior payment. I.C. § 23-1-44-19. The legal rate of interest is 8%.

The trial court valued the Trust's 48.4% interest on the valuation date at $5,900,000, and determined that the value in excess of the $941,380 payment is $4,959,620. Although the trial court found that interest of 8% per year on the additional value amount was also due, it also noted that the "case took over eight (8) years to bring to an end [that] the Court believes it could have concluded in substantially less time." *Id.* at 75. As a result, the trial court found that a reasonable and equitable amount of interest to be $1,673,160.09.

The trial court further concluded that the fair value of the stock as of the valuation date was reduced in light of Lester's breaches of his fiduciary duties. As a result, the trial court determined that such value reduction should be considered in determining the judgment award. Thus, the trial court concluded that the "damage and resulting adjustment to value has been achieved by disregarding the real estate options contained in the [Compensation Agreement]." *Id.* at 77–78.

The trial court awarded the Trust $614,405.97 in attorney's fees and expenses, yielding a total judgment of $7,522,879.73, plus interest at 8% per annum until satisfied. Lees Inns now appeals and the Trust cross-appeals.

## DISCUSSION AND DECISION

### I. Standard of Review

■ As set forth above, the trial court entered findings of fact and conclusions of law pursuant to Indiana Trial Rule 52. As a result, we apply a two-tiered standard of review: we consider whether the evidence supports the findings, and whether the findings support the judgment. *Fowler v. Perry*, 830 N.E.2d 97, 102 (Ind.Ct.App. 2005). The trial court's findings will be set aside only if they are clearly erroneous, i.e., when the record contains no facts or inferences supporting them. *Id.* Further, when reviewing findings of fact, we neither reweigh the evidence nor assess the credibility of witnesses, but instead consider only the evidence most favorable to the judgment. *Id.*

### II. Lees Inns' Contentions

#### A. Appointment of Expert

Lees Inns first contends that the trial court abused its discretion in denying its motion to appoint a special master or expert to assist in addressing the valuation issues of the business. Specifically, Lees Inn maintains that an expert should have been appointed because the "$10 million difference between the appraisers' conclusions arose from ... matters that are outside the everyday knowledge of most judges." Appellant's Br. p. 18.

In resolving this issue, we first note that under the Dissenters' Rights Statute, the dissenter is entitled to "fair value" for the dissenter's shares, which is defined as "the value of the shares immediately before the effectuation of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of the corporate action unless exclusion would be inequitable." I.C. § 23–1–44–3.

Indiana Trial Rule 53 permits a trial court to appoint a special master in certain instances, but "a reference to a master shall be the exception and not the rule." T.R. 53(B). Additionally, Indiana Code section 23–1–44–19(d) provides that "the court *may* appoint one (1) or more persons as appraisers to receive evidence and recommend decision on the question of fair value." (Emphasis added).

■ In support of its claim that a master or appraiser should have been appointed, Lees Inns asserts that the valuation issue was central to the case, the issue was fraught with technical disagreements, and "those differences made millions of dollars of difference in the bottom line valuation." Appellant's Br. p. 23. Notwithstanding this contention, we note that our trial courts are frequently called upon to consider business valuations. Interestingly, Lees Inns has failed to explain why a small chain of midwestern hotels presents issues at the difficult end of the spectrum of such valuations. That said, Lees Inns' argument, which presupposes that a trial court does not have the ability to analyze expert testimony relating to the valuation of a business, is unavailing.

Additionally, Lees Inns has failed to offer any explanation why its chosen appraiser could not value the business the same as a special master or court-appointed appraiser might. In short, Lees Inns makes no compelling argument for the necessity of such an additional expert. Thus, we conclude that the trial court did not abuse its discretion in refusing to appoint a special master or appraiser regarding the valuation of Lees Inns.

## B. Valuation of the Business

Lees Inns maintains that the trial court erred in adopting the Deloitte appraisal as the basis for valuing the business. More particularly, Lees Inns argues that the appraisal was based on speculation and merely assumed that the company would expand by three hotels. Moreover, Deloitte's other model assumed—hypothetically—that Lees Inns would be acquired by another chain, thus permitting a significant cut in expenses. Thus, Lees Inns maintains that the Deloitte appraisal did not represent a "fair valuation" of the business. Appellant's Br. p. 18–19.

We initially observe that to preserve an alleged error based on the admission of, or reliance upon, an expert's opinion the party seeking to prevent the court's reliance on the opinion testimony must challenge the evidence prior to or during the trial and seek to have it excluded in accordance with Indiana Evidence Rule 702(b). *Franciose v. Jones,* 907 N.E.2d 139, 145 (Ind.Ct.App.2009). In this case, Lees Inns did not object to the admission of the Deloitte appraisal or to the expert testimony regarding that report. Moreover, it extensively cross-examined the expert witnesses about the report at trial. Thus, Lees Inns is precluded from asserting for the first time on appeal that the trial court should have disregarded the report and the expert testimony on the basis that the Deloitte appraisal was merely speculative.

That said, we now turn to the issue of whether the trial court's determination of the fair value of the Trust's' shares of Lees Inns' stock was supported by the evidence. In accordance with the Dissenter's Rights Statute, "fair value" is defined as the value of the shares "immediately before" the sale. I.C. § 23–1–44–3; *Galligan v. Galligan,* 741 N.E.2d 1217, 1224 (Ind.2001). "Fair value" contemplates that the shareholders will be fairly compensated, which may or may not be the same as the market's judgment regarding the stock's value. *Trietsch v. Circle Design Group, Inc.,* 868 N.E.2d 812, 820 n. 4 (Ind.Ct.App.2007).

Although there is no case law in Indiana specifying how dissenting shareholders' shares are to be appraised, we note that other states have adopted well-established principles that are based on statutory language similar to that of Indiana. For instance, in Delaware, the court must consider all "relevant factors" to determine "fair value" exclusive of "post-merger events or other possible business combinations." *Rapid–Amer. Corp. v. Harris,* 603 A.2d 796, 802 (Del.1992). With regard to fair value, "the dissenter in an appraisal action is entitled to receive a proportionate share of fair value in the going concern on the date of the merger, rather than value that is determined on a liquidated basis. Thus, the company must first be valued as an operating entity." *Cede & Co. v. Technicolor, Inc.,* 684 A.2d 289, 298 (Del.1996).

Additionally, "a dissenting stockholder in an appraisal action is only entitled to that which has been taken from him [or, in other words] his proportionate interest in a going concern." *Rapid–Amer.,* 603 A.2d at 805. "The statute contemplates that a reviewing court must exclude from its calculations any element of value arising from the accomplishment or expectation of the merger or consolidation...." *Id.* The above language is similar to Indiana's statute, "excluding any appreciation or depreciation in anticipation of the corporate action unless exclusion would be inequitable." I.C. § 23–1–44–3.

Additionally, a number of jurisdictions have determined that future elements susceptible of proof as of the merger date may be considered. *In re 75,629 Shares of*

*Common Stock of Trapp Family Lodge, Inc.,* 169 Vt. 82, 725 A.2d 927, 931 (1999) (observing that "the basic concept of fair value under a dissenters' rights statute is that the stockholder is entitled to be paid for his or her proportionate interest in a going concern"); *In re Valuation of Common Stock of McLoon Oil Co.,* 565 A.2d 997, 1004 (Me.1989) (recognizing that the focus of the valuation "is not the stock as a commodity, but rather the stock only as it represents a proportionate part of the enterprise as a whole"); *Musto v. Vidas,* 333 N.J.Super. 52, 754 A.2d 586, 592 (2000) (mandating going-concern value).

In light of the provisions set forth in Indiana Code section 23–1–44–3, Lees Inns maintains that the trial court's adoption of the Deloitte report as a basis for the judgment was erroneous as a matter of law because that valuation was based, in part, on the assumption that Lees Inns would be acquired by a large chain, allowing costs to be cut. Similarly, Lees Inns asserts that the trial court relied on tenuous assumptions and calculations that included transactions involving properties different in kind from the Lees Inns merger that cast significant doubt on the conclusions that the Deloitte report reached.

■ Notwithstanding Lees Inns' contentions, we note that the squeezed out shareholders' remedy is a valuation action in which they are entitled to seek "fair value" for the shares that have been taken from them. *Fleming v. Int'l Pizza Supply Corp.,* 676 N.E.2d 1051, 1056 (Ind. 1997). For this reason, the "fair value" determination is intended to achieve the goal "that shareholders be fairly compensated" for their loss. *Trietsch,* 868 N.E.2d at 820 n. 4. That said, we are of the view that the trial court was required to undertake a broad inquiry and consider all possible elements of the present value of the corporation on the valuation date, including current prospects for future value in determining the fair value of the dissenter's shares. As was observed in *Weinberger v. UOP, Inc.,* 457 A.2d 701, 713 (Del.1983):

> The basic concept of value under the appraisal statute is that the stockholder is entitled to be paid for that which has been taken from him, viz., his proportionate interest in a going concern. By value of the stockholder's proportionate interest in the corporate enterprise is meant the true or intrinsic value of his stock which has been taken by the merger. In determining what figure represents this true or intrinsic value, the appraiser and the courts must take into consideration all factors and elements which reasonably might enter into the fixing of value. Thus, market value, asset value, dividends, earning prospects, the nature of the enterprise and any other facts which were known or which could be ascertained as of the date of merger and which throw any light on future prospects of the merged corporation are not only pertinent to an inquiry as to the value of the dissenting stockholders interest, but must be considered by the agency fixing the value.

■ Additionally, the fair value provision of the Dissenter's Rights statute provides that the "value of the shares immediately before the effectuation of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of the corporate action unless exclusion would be inequitable." I.C. § 23–1–44–3. In light of this provision, it follows that *all* elements of a corporation's fair value must be considered on the valuation date, and elements of future value that are not attributable to the merger itself are properly considered in the calculation of fair value. *See Cede,* 684 A.2d at 300 (holding that the

corporation being valued "must be viewed and valued 'as an on-going enterprise, occupying a particular market position in the light of future prospects'") (quoting *In re Shell Oil Co.*, 607 A.2d 1213, 1218 (Del.1992)). In accordance with Indiana Code section 23–1–44–3 and the principles announced in *Cede*, it was appropriate for the experts valuing Lees Inns to consider the company's future plans and prospects, including plans to build additional hotels and/or to sell hotels, and to consider the potential impact that those prospects had upon the value of Lees Inns as of the valuation date.[3]

When considering the evidence that was presented at trial, we conclude that it was within the trial court's "discretion to select one of the parties' valuation models as its general framework, or [to] fashion its own." *Cede*, 758 A.2d at 489. It is apparent that the trial court took into account all of the factors and elements that might enter into the valuation. Therefore, the trial court properly considered the future prospects of Lees Inns including the nature of the enterprise, its business plans, and earning prospects in arriving at the stock's fair value. The trial court considered the various valuation models and demonstrated that its ultimate valuation determination fit within the ranges that were established by the parties. In short, the "fair value" of $5.9 million that the trial court assigned to the Trust's shares fell within the range of values that were developed through the analysis of the reports and testimony of the various witnesses. Thus, Lees Inns' contention that the trial court erred in its valuation of the business fails.

## C. Breach of Fiduciary Duty

Lees Inns next argues that the trial court's finding that Lester breached his fiduciary duty to the company was not supported by the evidence and the law. Specifically, Lees Inn claims that the Trust failed to establish willful or reckless conduct sufficient to overcome Indiana's "management-friendly business judgment rule." Appellant's Br. p. 19. Moreover, Lees Inn contends that the trial court's remedy ordering that the valuation of the business exclude Lester's options is inconsistent with the finding and the measure of damages for breach of fiduciary duty. Therefore, Lees Inn argues that this portion of the judgment cannot stand.

We initially observe that the "majority shareholder owes fiduciary duties to the minority shareholders." *Galligan*, 741 N.E.2d at 1228. Shareholders must deal fairly, honestly, and openly with the corporation and other shareholders. *Fleming*, 676 N.E.2d at 1056. Under the business judgment rule there is "a presumption that in making a business decision, the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *G & N Aircraft Inc. v. Boehm*, 743 N.E.2d 227, 238 (Ind.2001).

In judging fiduciary breach allegations, "there must be a balance struck

---

**3.** With regard to whether a projection of future sales of hotels was appropriate, Lees Inns concedes that "[i]n the 1990s Lees Inns made efforts to market several of its properties for sale" and by 2000 had sold three hotels and a vacant parcel. Appellant's Br. p. 5. Moreover, Lees Inns had entered into an agreement in 1997 to sell all of its hotels, and that agreement had fallen through only be-

cause the prospective buyer had been acquired. Lees Inns also acknowledges that when the valuation was performed in 2000, Lees Inns engaged in certain "expansion attempts" that Lester claimed "were frustrated by lack of available capital." *Id.* at 5. Lees Inns opened new hotels in 1997 and 1998, and significant expansions had originally been planned.

between the majority's fiduciary obligations and its rights." *Id.* at 240. Moreover, it is "the policy of the law to leave corporate affairs to the control of corporate agencies except in a plain case of fraud, breach of trust, or such maladministration as works a manifest wrong to [the shareholders]." *Id.* at 240–41. Indiana's business judgment rule is management-friendly, designed to protect corporate managers and directors from undue judicial interference. *Id.* at 238.

We also note that "once a corporate officer's compensation is challenged, the burden of establishing unreasonable compensation lies with the minority shareholder instituting the action." *Krukemeier v. Krukemeier Mach. & Tool Co.*, 551 N.E.2d 885, 887 (Ind.Ct.App. 1990). Proving overcompensation "requires a plaintiff shareholder to show the compensation is unjust, oppressive, or fraudulent." *Id.* at 888.

In this case, the various breaches of duty found by the trial court include: (1) Lester's options to acquire certain Lees Inns properties at below-market prices without "objective corporate due diligence"; (2) Lester's increase in compensation "without establishing reasonable, independent and objective fairness"; (3) Lees Inns' payment of increased rents to Lester for certain space leased from Lester without "reasonable due diligence"; and (4) Lester's borrowing of more than $1 million from Lees Inns at low interest rates. Appellant's App. p. 58–59.

Before addressing Lees Inns' attacks on the specific findings of Lester's breach of fiduciary duty, we note that the evidence at trial established that the relationship among the parties deteriorated rapidly after Donald, Robert, and William resisted Lester's efforts to merge Lees Inns with Maxim. At a meeting in 1998, Lester informed Donald and Robert that

he would "nail [their a**es] to the wall, . . . screw [them] at every opportunity . . . [and] do everything [he] could to make sure [they] never receive one dime from this company." Tr. p. 425, 586, 1041–42.

Thereafter, at the November 29, 1999, Board meeting, Lester was granted several options to purchase many of Lees Inns' hotels. The Board also approved a one-time payment of $400,000 to him. The Compensation Agreement in 1999 added several new options and increased the value of existing options without additional consideration from Lester.

Lees Inns maintains that the trial court's findings regarding Lester's increased compensation, the increased rental rates that Lester charged Lees Inns, and the options that were conveyed to Lester to purchase interests in Lees Inns hotels in connection with his guarantees of loans that were made to Lees Inns, lack evidentiary support, are insufficient to establish that Lester breached his fiduciary duties, and must be set aside. Moreover, as noted above, Lees Inns argues that even if a breach of fiduciary duty occurred, the trial court "vastly overvalued it," especially after admitting "that it could not quantify damages arising from the breach." Appellant's Br. p. 53.

A number of unchallenged findings establish that Lester's salary was more than doubled by the Board in December 1997, immediately after Donald and Robert were removed from the Board. Lees Inns' salaries were traditionally increased by 3% to 5% annually, and a more than 100% increase was "unprecedented." Tr. p. 433. Moreover, it was established that Lees Inns lost money in the years that Lester's compensation escalated, and Lees Inns's administrative expenses, which included salaries, were significantly higher than other hotel chains in comparison to its

income. In light of this evidence, we cannot say that it was clearly erroneous for the trial court to conclude that Lester's acceptance of substantially increased compensation wrongfully advanced his interests to the detriment of the Trust.

Other unchallenged findings with regard to Lester's breach of fiduciary duty include:

    (i) Lees Inns leased space from Lee for its headquarters in North Vernon.

    (ii) Lee more than tripled the rent he personally charged [Lees Inns] commencing with rents due in 1998.

    (ii) The rent Lee charged [Lees Inns] subsidiary Prime Construction was increased by an even larger margin: the 1998 rent was 6.2 times higher than the 1997 rent.

Appellant's App. p. 60.

We note that Lees Inns is comparing a lease between Lester and the United States Government in support of his claim that Lester's lease with Lees Inns and the one with Prime Construction Management, Inc. (Prime Lease), was reasonable. Although the initial rents are similar, the evidence established that the fees regarding the Lees Inns' leases automatically increases by 10% each year, whereas the Government Lease provides for a constant rental rate. *Id.* at 161. Because of the annual rent increases that were built into the Lees Inns leases, it is apparent that Lester received a windfall at the expense of the shareholders. Moreover, the Government Lease requires Lester to provide all utilities, along with extensive janitorial services. *Id.* at 162. In contrast, the lessee in the Lees Inns leases is required to pay for all utilities, taxes, and insurance. Tr. p. 1071–88.

When considering the different terms in the leases, which pertain to matters that are significant to the value and reasonableness of such leases, the Government Lease is not comparable to the Lees Inns leases. Therefore, it was not clearly erroneous for the trial court to find that Lester's lease arrangements improperly promoted his personal interests to the detriment of the Trust.

We also note that various findings regarding Lester's real estate guarantees and options have also not been challenged:

    (i) Lee did not provide a guaranty of the German American Bank loan to LIA as required in the 1999 [Compensation Agreement].

    (ii) Lee received a "$400,000 loan guaranty fee" in 1999.

    (iii) Lee profited handsomely from his personal real estate transactions with [Lees Inns].

    (iv) Lee testified the purpose of the options granted him in 1992 was to protect him in the event of foreclosure or bankruptcy.

    (v) The purpose of the 1999 [Compensation Agreement], including the options granted therein, "was to lower the company value."

Appellant's App. p. 53, 62–63. In addition to the above, Lester testified that he received a personal benefit from transactions involving Wal–Mart, Ritter's, and a strip mall. Tr. p. 330–32. When Lester was asked if he personally gained $1.4 million from these transactions, he responded that he "never added it up," and would "leave it to the math." *Id.* at 1331–32.

The evidence also established that Lester was over $1 million in debt to Lees Inns at the time of the merger. *Id.* at 56–57. The trial court considered testimony establishing that Lester's unsecured indebtedness to Lees Inns was not disclosed to shareholders in the annual report. Tr. p. 348–49, 368–370, 1131–1137. Moreover, the funds that Lester borrowed from Lees

Inns accrued interest at the rate of 6%, but the money he loaned to Lees Inns accrued interest at the rate of 8%. *Id.* at 370–71. In light of this evidence, the trial court could reasonably infer that the arrangement—with a 2% difference in Lee's favor—benefited Lee to the detriment of Lees Inns and the Trust.

As noted above, the 1999 Compensation Agreement provided Lester with a substantial one-time payment. Moreover, that agreement granted real estate purchase options on many of Lees Inns' property, purportedly in exchange for seven prior guaranties that Lester made on loans of Lees Inns, a future guarantee to be made on a pending $4.8 million load form German American Bank (GAB), and any guaranties required by lenders in the future.

The 1999 Compensation Agreement provided many more favorable terms to Lester than did the previous agreement in 1992. Lester never executed the GAB guaranty, so this condition of the Compensation Agreement was never satisfied. He also made no guarantees on any loans after the November 29, 1999, date of the Compensation Agreement, as of the merger date. Thus, Lester provided no consideration to Lees Inns for the options that were granted to him. Hence, those options were unenforceable, and the trial court's finding that the grant of options to Lester without consideration constituted a breach of fiduciary duty was not clearly erroneous.

The evidence also supports the trial court's conclusion that Lester violated his fiduciary duty to Lees Inns because he failed to inform the Board and minority shareholder of the negative effects that the Compensation Agreement would have on the value of the company's assets. Lester admitted that it was partly his responsibility to explore and know the impact that the Compensation Agreement would have on the value of the company. *Id.* at 628. When asked whether it was his intent for the Compensation Agreement to have a negative impact on the value of Lees Inns, Lester answered, "I don't know." *Id.* at 528. One of the board members admitted that it relied on Lester's advice for business decisions, and that she, as a director, would have asked more questions about the Compensation Agreement if she had been informed of its negative impact on the company's value. *Id.* at 222–23. In our view, the trial court could reasonably infer from this testimony that Lester either failed to investigate the impact of the Compensation Agreement or that he purposefully withheld this information from the Board.

Finally, with regard to Lees Inns challenge to the trial court's decision to disregard the value of the real estate options that were bestowed upon Lester as the basis for compensating the Trust for Lester's breaches, we note that in cases involving lost profits, "less certainty is required to prove amount of loss than is required to prove the fact that profits were in truth lost." *Jerry Alderman Ford Sales, Inc. v. Bailey*, 154 Ind.App. 632, 652, 291 N.E.2d 92, 106 (1972), *clarified on other grounds on reh'g*, 154 Ind.App. 632, 294 N.E.2d 617 (1973), *trans. denied.* Moreover, "evidence of profits is not open to the objection of uncertainty where there is testimony which, while not sufficient to put the amount beyond doubt, is sufficient to enable the [factfinder] to make a fair and reasonable finding with respect thereto." *Id.* Doubts and uncertainties as to the proof of the exact measure of damages "must be resolved against the defendant because the most elementary conception of justice and public policy requires that the wrongdoer bear the risk of uncertainty which his own wrong has created." *Boone*

*County Rural Elec. Membership Corp. v. Layton,* 664 N.E.2d 735, 741 (Ind.Ct.App. 1996). Also, "where there is any doubt as to the exact proof of damages, such uncertainty must be resolved against the wrongdoer." *Columbus Med. Servs. Org., LLC v. Liberty Healthcare Corp.,* 911 N.E.2d 85, 96 (Ind.Ct.App.2009). The rationale for leniency in proving damages where a breach of duty has occurred is that the breaching party must be required to bear all the consequences of his conduct including any uncertainty about whether his conduct has made damages more difficult to prove. *Leigh v. Engle,* 727 F.2d 113, 138 (7th Cir.1984).

In the context of the Dissenter's Rights Statute, we have determined that the statutory "fair value" remedy provided shareholders is intended to protect the interests of shareholders whose ownership interests are being taken and to prevent the acquiring shareholder from receiving a windfall. *Wenzel v. Hopper & Galliher,* P.C., 779 N.E.2d 30, 39 (Ind.Ct.App.2002).

Analogous here are the circumstances that were presented in *Leigh,* which involved a reduced burden of proving damages in a trademark infringement case. The *Leigh* court observed that

> Where an infringer's profits are the product of both the infringer's own efforts and the infringement, a precise calculation is virtually impossible, yet justice requires that courts make estimates. In making an estimate, because the defendants are responsible for 'mingling the plaintiffs' property with their own,' doubts should be resolved against the defendants so that the amount awarded 'will favor the plaintiffs in every reasonable chance of error.'

727 F.2d at 138 (quoting *Sheldon v. Metro–Goldwyn Pictures Corp.,* 106 F.2d 45, 51 (2nd Cir.1939)).

Here, the trial court made specific findings that Lester repeatedly breached his fiduciary duties through a course of conduct that culminated in squeezing the Trust out of corporate ownership. Lester controlled the corporate finances, and he was the individual to whom the directors and shareholders turned for financial guidance and information. The evidence established that Lester abused this position of trust by profiting from corporate opportunities, devaluing the company through entering the Compensation Agreement, and failing to keep the directors and shareholders properly informed of the financial situation of the company.

In light of these circumstances, the evidence supports the conclusion that the fair value of the stock in Lees Inns was reduced as a result of the various breaches of fiduciary duty in which Lester engaged. Thus, the reduction in value should be considered in calculating the judgment award. Because the trial court could not calculate the amount of damages that the Trust sustained from Lester's fiduciary breaches with precision, we believe that it was appropriate for the trial court to have disregarded the real estate options that were contained in the Compensation Agreement to compensate the Trust for its losses.

### III. Cross–Appeal

The Trust cross-appeals, claiming that the trial court abused its discretion in not awarding the full amount of prejudgment interest that it requested. In support of its contention, the Trust directs us to Indiana Code section 23–1–44–19(e), which provides that "Each dissenter made a party to the proceeding is entitled to judgment: (1) for the amount, if any, by which the court finds the fair value of the dissenter's shares, plus interest, exceeds the amount paid by the corporation...." A companion statute, Indiana Code section

23–1–44–4, states that a successful dissenter is entitled to "interest from the effective date of the corporate action until the date of payment, at the average rate currently paid by the corporation on its principal bank loans or, if none, at a rate that is fair and equitable under all the circumstances." Therefore, the Trust maintains that the trial court is not permitted to exercise discretion regarding any aspect of a prejudgment interest award unless there is no "average rate currently paid ... on its principal bank loans." I.C. § 23–1–44–4.

Notwithstanding these contentions, the Trust acknowledges that Indiana Code section 23–1–44–4 is not written entirely in mandatory terms. As noted above, the statute affords the trial court some discretion in setting the rate of interest. Because the trial court found that the Trust contributed to the lengthy delay in bringing this case to trial—and the record supports that finding [4]—the Trust should not be permitted to benefit from its own delay by receiving eight years' worth of interest. As a result, we conclude that the trial court did not abuse its discretion in limiting the amount of prejudgment interest that it awarded to the Trust.

The judgment of the trial court is affirmed.

BAILEY, J., and ROBB, J., concur.

---

[4]. Although the trial court did not cite to specific instances regarding the Trust's responsibility for its part in the delay, the Chronological Case Summary (CCS) reveals that the Trust filed its counterclaim for breach of fiduciary duty one year after Lees Inns filed the initial petition. Appellant's App. p. 6. The Trust engaged in frequent motion practice throughout this case, and it requested a preliminary injunction on June 14, 2005. *Id.* at 1–47. The Trust subsequently withdrew that request on February 22, 2006. *Id.* at 19, 24. The CCS also shows that there were several gaps of time where no action was taken. *Id.* at 11, 16, 19–20, 24–25, 28. Finally, although the trial was initially set to begin on January 6, 2003, the date was moved several times, and the trial did not commence until September 2008.